## No. 4785.

### MARCO GIOVANOVICH *v.* CITIZENS' BANK OF LOUISIANA.

Plaintiff claims to be the owner of certain notes which were placed by his agent into the hands of Ducros, a broker, to be sold by him, and which he avers that Ducros illegally pledged to the defendant as security for a debt of his own.

That Ducros owed the Bank when the notes were put in its possession can not be disputed; that they were given to secure its indebtedness is established; and that the Bank had the right to receive them, is equally clear. The lawful possession of the notes by Ducros can not be questioned. Being the lawful possessor, he was, as to third parties, the owner. Being the apparent owner, he could dispose of them; if he saw fit to place them in the hands of the Bank in extinction of, or as a security for, a lawful debt, the Bank had the right to receive them, and they must remain with the Bank until its debt is paid. The responsibility is from Ducros to his principal; and not from the Bank to the party who claims that Ducros cheated him.

The burden of proof was on the plaintiff to prove, as he alleged, that the Bank gave no valuable consideration for the notes; that it is not the *bona fide* holder thereof; and that they came into the possession of the Bank in an illegal and unlawful manner. There was nothing in the transaction beyond the taking by the Bank of security for the payment of a pre-existing debt, and this it was authorized by law to do.

APPEAL from the Superior District Court, parish of Orleans. *Hawkins*, J. *Johnson & Denis*, for plaintiff and appellee. *A. Pitot*, for defendant and appellant.

MORGAN, J. Ducros was a broker and a dealer in notes and stocks in this city, where he had business transactions with several of the banks. His operations appear to have been large. His account with the Citizens' Bank alone, for the month of February, 1873, exceeded $90,000. In that bank, he had a note falling due on the first of March, 1873, for $8000. · The payment of this note was secured by the pledge of several other notes, as follows:

| | |
|---|---|
| Mortgage note of J. Cazabene | $2,000 |
| Mortgage note of J. Cazabene | 1,000 |
| Mortgage note of M. Lopez | 1,000 |
| Mortgage note of M. Lopez | 1,100 |
| Mortgage note of M. Lopez | 1,136 |
| Mortgage note of Marmiche | 5,000 |
| | $11,230 |

He lacked $3538 93, to the credit of his account to make up the sum required for the payment of his note. He was authorized by the bank to overdraw his account, leaving still in the possession of the bank the pledged notes.

The bank is in the habit of making call loans. In these loans no note is given to the borrower; the bank either gives a check or permits the borrower to overdraw his account on depositing securities. With these securities in the possession of the bank, Ducros was permitted to overdraw his account on March 1, $3538 93, on the third of March, $1729 25, and on the fourth of March, $5000. Thus, on that

date, he was indebted to the bank, for what the bank terms call loans $10,268 18. The margin of the bank's security was therefore $962.

On the seventh of March, Ducros withdrew the pledged notes from the bank, through his clerk, telling the defendant that he intended to sell them and, with the money received, to settle his account. Ducros had been for many years a broker, and possessed the confidence of the community. The debt to the bank was not paid. The cashier called upon him either to pay the amount due, or to return the securities. A short time afterwards he gave to the bank the following notes :

| | |
|---|---:|
| Note of A. Lopez for | $1,000 |
| Note of A. Lopez for | 1,100 |
| Note of A. Lopez for | 1,136 |
| Note of Mrs. Giordano for | 4,000 |
| Note of Mrs. Giordano for | 4,000 |
| Note of Mrs. Giordano for | 4,000 |
| Note of Marmiche for | 5,000 |
| Total | $20,236 |

And there the matter seems to have rested for some two or three weeks, when Ducros disappeared. Thereupon the bank instituted suit against him claiming the amount due ($10,018 18), alleging that the sum due was on called loans, averring that the notes above described were held by it as a pledge to secure the payment thereof, asking judgment against Ducros, and praying that the notes be sold and that it be paid out of the proceeds. The suit was instituted on the first of May, 1873. What disposition was made of it does not appear.

On the sixth of May, 1873, the present suit was instituted. Plaintiff claims that he is the owner of the three Giordano notes for $4000 each. He alleges that these notes, on or about the first of April, 1873, were in the possession of Dominique Bouligny, his agent; that Bouligny, acting for petitioner, placed them in the hands of Ducros with instructions to sell them for his account; that Ducros has failed to account either to Bouligny or to himself for their proceeds; that the notes are in the Citizens' Bank; that the bank gave no valuable consideration for them, and is not the bona fide holder thereof; that they came into its possession in an illegal and unlawful manner, and detains them without any right or justice. He prays that the notes be decreed to belong to him, and for their delivery. There was judgment in his favor, and the bank has appealed.

The judgment is wrong.

Plaintiff admits the general rule of law to be, in respect to negotiable paper, that the holder is presumed to have acquired it in the usual course of business and for value, and that the burden of proof

is on the party impeaching his title. But, quoting the words of Edwards (p. 292), he claims that "the party in possession of a negotiable instrument is *prima facie* the owner of it; but as soon as it is shown to have been lost or stolen from the true owner, the presumption is changed, and he must then show not only what consideration he gave for it, but also that he took the paper in good faith, in the ordinary course of business." And he contends, under this authority, that the plaintiff having proved that the notes belonged to him, that he placed them for sale in the hands of Ducros, and that the latter fraudulently dealt with them, it remains for the bank to establish that it took them in the usual course of business, and gave a full and valuable consideration for them.

But the notes in question were not lost; they were placed by the plaintiff in the hands of his agent for sale. They were not stolen; they were given by this agent to Ducros to be disposed of. He could have done with them almost as he pleased. Certainly he could have sold them, as it was for this purpose they were placed in his hands, and if, after having sold them, he had embezzled the money which he had received for them, the innocent purchaser's title would be good.

That Ducros owed the bank when the notes were put in its possession is not disputed; that they were given to secure this indebtedness is established, and that the bank had the right to receive them we think equally clear. The lawful possession of the notes by Ducros can not be disputed. Being the lawful possessor, he was, as to third parties, the owner; being the apparent owner, he could dispose of them; if he saw fit to place them in the hands of the bank in extinction of or as security for a lawful debt, the bank had the right to receive them, and they must remain with the bank until its debt is paid. The responsibility is from Ducros to his principal, and not from the bank to the party who claims that Ducros cheated him.

In Swift *v.* Tyson, 16 Peters, p. 1–19, the Supreme Court of the United States said:

"We have no hesitation in saying that a pre-existing debt does constitute a valuable consideration in the sense of the general rule already stated, as applicable to negotiable instruments. Assuming it to be true (which, however, may well admit of some doubt from the generality of the language) that the holder of a negotiable instrument is unaffected with the equities between the antecedent parties, of which he has no notice, only where he receives it in the usual course of trade and business for a valuable consideration before it becomes due, we are prepared to say, that receiving it in payment of or as security for a pre-existing debt, is according to the known and usual course of trade and business. And why upon principle should not a pre-exist-

2

ing debt be deemed such a valuable consideration? It is for the benefit and convenience of the commercial world to give as wide an extent as practicable to the credit and circulation of negotiable paper, that it may pass not only as security for new purchases and advances made upon the transfer thereof, but also in payment of and as security for pre-existing debts. The creditor is thereby enabled to realize or to secure his debt, and thus may safely give a prolonged credit, or forbear from taking any legal steps to enforce his rights. The debtor also has the advantage of making his negotiable securities of equivalent value to cash. But establish the opposite conclusion, that negotiable paper can not be applied in payment of or as security for pre-existing debts, without letting in all the equities between the original and antecedent parties, and the value and circulation of such securities must be essentially diminished, and the debtor driven to the embarrassment of making a sale thereof, often at a ruinous discount, to some third person, and then by circuity to apply the proceeds to the payment of his debts. What, indeed, upon such a doctrine would become of that large class of cases where new notes are given by the same or by other parties, by way of renewal or security to banks, in lieu of old securities discounted by them, which have arrived at maturity? Probably more than one-half of all bank transactions in our country, as well as those of other countries, are of this nature. The doctrine would strike a fatal blow at all discounts of negotiable securities for pre-existing debts. * * * We entertain no doubt that a bona fide holder, for a pre-existing debt, of a negotiable instrument is not affected by any equities between the antecedent parties, where he has received the same before it became due, without notice of any such equities."

It will be seen that one of the cases used as illustration in the foregoing extract is the case now under consideration. But plaintiff contends that Mr. Justice Catron refused to concur in the portion of the opinion which has just been quoted, because the decision of the case did not require it, and he contends that in the case of Goodman v. Simmons, 20 Howard 343, the same court intimated very clearly that such doctrine formed no part as yet of the jurisprudence of the country. But turning to that decision we find the following:

"A well defined and correct exposition of the rights of a bona fide holder of a negotiable instrument was given by this court in Swift v. Tyson, 16 Peters p. 1, as long ago as 1842; and we adopt that exposition relative to the point under consideration on the present occasion, as one accurately defining the nature and character of the title to those instruments which such holder acquires when they are transferred to him for a valuable consideration. This court then said, and we now

repeat, that a bona fide holder of a negotiable instrument for a valuable consideration, without notice of facts which impeach its validity between the antecedent parties, if he takes it under an indorsement made before the same becomes due, holds the title unaffected by these facts, and may recover thereon, although, as between the antecedent parties, the transaction may be without any legal validity."

He contends, further, that Swift v. Tyson was a case of payment and not of pledge or security. But we do not see how this can help him. The greater includes the lesser. If Ducros' debt was a valid one, and the notes were in his possession, he could have sold them to a third party and appropriated the proceeds to the payment of the bank's debt, or he could have sold them to the bank. Surely if he could sell them, and thus destroy the real owner's title entirely, he could pledge them, and thus enable the owner to redeem them, if he saw fit, and save whatever balance might remain between the amount for which they were pledged and the amount of the notes.

He contends, further, that defendants do not come under the case in 16 Peters, because the bank in receiving the notes granted no extension of time to Ducros, and forebore from no proceedings against him, as a few days later it was bringing suit and asking judgment against him. But in another part of his argument he says that if Ducros' account was overdrawn the bank should have prosecuted him, or at least have exposed him. We do not see how a bank can prosecute a depositor who has overdrawn his account, when the account was overdrawn with its consent; and its interest was to get its debt secured, not to expose its debtor. He was a mere ordinary debtor, and exposure would have shown an indebtedness, incurred with the consent of the bank, and nothing more. The bank could have reclaimed the pledged notes which they had intrusted to him, and this it did, and got them nearly all back, and others beside, among them those now in suit. It could, it is true, have pursued him at once for debt, but this it had no object in doing, as it was secured, and forbearing to sue was a consideration for the pledge. Suit was only brought after Ducros, the pledgeor, had disappeared, and when it was absolutely necessary to protect its rights.

It having been established that Ducros owed the bank, and that the notes were given to secure the payment of his debt, the burden of proof was on the plaintiff to establish the allegations of his petition, upon the truth of which alone he could recover: that the bank gave no valuable consideration for them, and is not a bona fide holder, and that they came into its possession in an illegal and unlawful manner. This affirmative, which he holds, he has not established by the evidence. We see nothing in the transaction of the bank except the

taking security for the payment of a pre-existing debt, and this we think it was authorized by law to do.

It is urged upon us that the bank indulged Ducros by allowing him too long a time in which to pay his debt. But so long as the bank was secured, we suppose time was a matter of small consequence to it. But if the plaintiff suffers from the indulgence of the bank to Ducros, he suffers to a much greater degree from the indulgence of his own agent. The notes were given to him for negotiation about the first April. The agent says: "I saw Mr. Ducros several times afterwards, and he told me that he had not sold them yet. I then claimed the notes from him, telling him that I did not want them sold, and to return them to me. He said that the notes were in his bank box, and that as soon as his clerk would come he would send them to my office. The last time I saw him was on the twenty-eighth April. He repeated to me the same thing, and said that in half an hour the notes would be at my office." This was the day upon which he says Ducros disappeared. It certainly was no greater indulgence on the part of the bank to Ducros to allow the debt against him to stand, secured as it was by abundant collaterals, than it was negligence on the part of the agent to allow them to remain so long in his hands after having demanded them of them, and after he had promised to return them immediately. We think the reason for the one, as for the other, is to be found in the fact that the bank considered itself entirely secured, and that both the bank and the agent had entire confidence in the man whom they both trusted, and who, the agent says, "enjoyed the confidence of all the people."

It is therefore ordered, adjudged and decreed that the judgment of the district court be avoided, annulled and reversed, and that plaintiff's demand be rejected with costs.

WYLY, J., *dissenting.*

Rehearing refused.