In the Matter of LEA FABRICS, INC., a corporation of the State of Delaware, Bankrupt.

No. B–50–59.

United States District Court
D. New Jersey.

Jan. 29, 1964.

Samuel M. Coombs, Jr., Stanley Weiss, Furst, Furst & Feldman, by George Furst, Newark, N. J., for Max Mehler, Trustee.

Kleinberg, Moroney & Masterson, by James E. Masterson, Newark, N. J., for Ardisco, Ltd.

WORTENDYKE, District Judge.

This case is before the Court at this time on the respective cross-petitions by (1) Ardisco, Ltd., a turn-over claimant of proceeds of Receiver's sale of bankrupt's assets covered by claimant's chattel mortgages, and (2) bankrupt's Trustee, both for review of the Referee's order of June 28, 1963. That order denied the turn-over claim of Ardisco, di-

rected Ardisco to repay to the Trustee, with interest, $75,000.00 previously paid to Ardisco out of the proceeds of the Receiver's sale, and denied certain relief sought by the Trustee in his counterclaim against Ardisco. Lea Fabrics, Inc., a Delaware corporation, having its principal place of business in New Jersey, was adjudicated a bankrupt and Max Mehler, Esq.,[1] was appointed and qualified as its Trustee on February 18, 1960.

The Referee's Findings of Fact and Conclusions of Law are quoted at length in Appendix A–I, hereto attached.

The Trustee contended before the Referee that (1) the transfer of bankrupt's collateral to Ardisco was null and void under N.J.S.A. 14:14–2; (2) the transfer of said collateral was fraudulent because made with actual intent to hinder, delay and defraud present and future creditors of the bankrupt, for an inadequate consideration, at a time when the bankrupt was insolvent, and left Lea with an inadequate capital with which to continue in business; (3) Ardisco, Reldan and Stratford were participants in and beneficiaries of the transfer of collateral which involved breaches of duty owed by the officers, directors and controlling stockholders of the bankrupt to the bankrupt and to its creditors and by the bankrupt to its creditors.

Ardisco contended before the Referee that (1) its loan transaction with the bankrupt did not violate the provisions of N.J.S.A. 14:14–2[2]; (2) there was a failure of proof that the bankrupt was insolvent when the loan was made; (3) the evidence failed to show that Ardisco was not a bona fide purchaser for value without notice of bankrupt's insolvency; (4) the transfers of collateral were not shown to have been fraudulent; (5) there was no evidence of Ardisco's participation in any wrong-doing; and (6) Ardisco's claim to the proceeds of the sale of the pledged assets of Lea is supported by the preponderance of the evidence.

The Trustee here seeks review of so much of the Referee's order of June 28, 1963 as denies the relief sought in his counterclaim, which seeks, *inter alia*, to void the transfers to Ardisco under N.J.S.A. 14:14–2, upon the following grounds: (a) the denial of such relief is inconsistent with the Referee's conclusion that the transfer of Lea's collateral having a situs in New Jersey to Ardisco on May 31, 1957 is void; (b) the Referee erroneously concluded that N.J.S.A. 14:14–2 must be limited to collateral having a situs in New Jersey; (c) even if New Jersey law is not applicable to a portion of the collateral assigned, a determination should have been made as to the propriety of the transaction under other applicable law; and (d) the Referee erroneously concluded that the pleadings did not encompass the Trustee's contentions that the transfer of collateral was (1) fraudulent and (2) violative of the fiduciary obligations owed by the officers, directors and controlling stockholders of Lea to Lea and its creditors and by Lea to its creditors.

---

1. Creditors of Lea had brought actions against it in the Superior Court of New Jersey, in one of which Max Mehler, Esq. had been appointed Receiver of the property of the debtor. The Receiver had given notice that he would sell certain items of defendant's personal property on January 22, 1959 at public auction. On January 21, 1959 Lea petitioned this Court for leave to proceed under Chapter XI of the Bankruptcy Act. By its order of that date, this Court granted such relief to the debtor and referred the matter to the Referees in Bankruptcy of this Court. Mr. Mehler was appointed Receiver of the debtor's property by this Court's further order of the same date.

2. N.J.S.A. 14:14–2 provides, in pertinent part, as follows:

"14:14–2. CONVEYANCES, ASSIGNMENTS OR TRANSFERS AFTER INSOLVENCY OR IN CONTEMPLATION OF INSOLVENCY VOID AS AGAINST CREDITORS; BONA FIDE PURCHASERS; EXCEPTIONS.

"When any corporation shall become insolvent or shall suspend its ordinary business for want of funds to carry on the same, neither the directors nor any officer or agent of the corporation shall sell, convey, assign or transfer any of its real or personal property, choses in action, rights or credits, nor shall they or any of them make any such sale, convey-

Lea Fabrics, although incorporated in the State of Delaware in 1925, had from its inception conducted its business at and from its only plant at 768 Frelinghuysen Avenue, Newark, New Jersey. It conducted all of its manufacturing, purchasing, sales, research and development, office work and record keeping at that plant. Until the Ardisco "loan closing" in New York City, Lea did its banking with National Newark and Essex Banking Company in Newark; but, at the conclusion of the "closing" Lea opened an account in the New York Trust Company in New York City, in which it deposited the check which it took away from that "closing." A few days later Lea transferred most of that balance to the Newark bank to meet a charged overdraft on that account. The written agreement of May 31, 1957 (Appendix A–II) which sets forth the terms and conditions of the Ardisco "loan" provided that New York law should govern the transaction. It was the contention of the Trustee before the Referee, and before this Court that Lea's intangibles had a situs in New Jersey; that their disposition upon insolvency is subject to New Jersey law in any event, and that no other State has such an interest in the transaction here questioned as would preclude the application of New Jersey law thereto.

On May 31, 1957, Lea transferred the following collateral to Ardisco, which allegedly has realized the indicated respective amounts thereon:

| | |
|---|---|
| Chattel mortgage on machinery and equipment at the Newark plant | $132,565.83 |
| Limited license rights to distribute 179 Lantz cartoons | 350,000.00 |
| Receivables under contracts to exhibit those cartoons | 119,645.91 |
| Storm-Vulcan chattel and realty mortgages securing indebtedness to Lea | 110,000.00 |
| Second realty mortgage on Lea's Newark plant | (No equity) |
| Second preferred maritime mortgage on S.S. HAROLD D. WHITEHEAD | (No value) |

■■ The Trustee contends, and we believe with propriety, that the license rights in the Lantz cartoons, with their related accounts receivable, the Storm-Vulcan indebtedness to Lea, which was secured by chattel and realty mortgages, the second mortgage on the plant and the maritime mortgage, were intangible assets of the bankrupt, available to its creditors if transferred in violation of N.J.S.A. 14:14–2. The Trustee is apparently seeking the recovery of these intangible assets in his status as an ideal lien creditor under § 70, sub. c of the Bankruptcy Act, 11 U.S.C. § 110, sub. c. Under this section, the Trustee's status as an ideal creditor is created by the Federal statute, but state law determines what such a creditor is entitled to receive, In re Kravitz, 3 Cir. 1960, 278 F.2d 820; In re Consorto Construction Co., 3 Cir. 1954, 212 F.2d 676. In so looking to state law in the present case, the problem is one of a choice of applying New Jersey or New York law (the latter because of the stipulation in the loan agreement). In making such a choice of law, the question is whether this court should

ance, assignment or transfer in contemplation of insolvency.

"Any such sale, conveyance, assignment or transfer shall be null and void as against creditors, except that a bona fide purchase for a valuable consideration, before the corporation shall have actually suspended its ordinary business, by any person without notice of such insolvency or of the sale being made in contemplation of insolvency, shall not be invalidated or impeached. * * *"

follow a Federal conflicts of law rule in applying the Bankruptcy Act or, as in diversity cases, the conflicts rule of the state. See 4 Collier on Bankruptcy, Para. 70.49, p. 1419; cf. In re Rosen, 3 Cir. 1946, 157 F.2d 997, 998–999, cert. den. Fisch v. Standard Factors Corp., 1946, 330 U.S. 835, 67 S.Ct. 972, 91 L.Ed. 1282. In the present case, the problem is academic because there appears to be no difference between the choice of law rules under Federal or New Jersey authorities.

■■■ Putting aside for the moment the stipulation in the loan agreement that New York law would control, the issue is what law governs the validity *as to third parties* of assignments and transfers of intangibles.[3] This question cannot be decided on the basis of the situs of the property, as it can be with tangible movables, Restatement Conflict of Laws, § 257, because such intangibles do not have a physical situs, Ehrenzweig on Conflict of Laws, 1962, pp. 635–636. (The question of the situs of intangibles for the purpose of determining the jurisdiction of a court over them, Restatement Conflict of Laws § 51, Comment b, Harris v. Balk, 1905, 198 U.S. 215, 25 S.Ct. 625, 49 L.Ed. 1023, is not relevant to the choice of law question. Clearly the Bankruptcy Court had jurisdiction over the intangible collateral by virtue of the presence of both Lea and Ardisco before it.) Although the validity of an assignment of intangibles between the assignor and assignee would be governed by the law of the place of the assignment, Callwood v. Virgin Islands National Bank, 3 Cir. 1955, 221 F.2d 770, such a choice of law rule is inappropriate to the determination of the validity of the assignment as to creditors of the assignor or assignee, and the choice of law in such a case depends upon an analysis of each particular situation, Ehrenzweig on Conflict of Laws, 1962, § 242, pp. 636–637.

■■■ In the present case, Lea Fabrics from its incorporation, under Delaware law, conducted all its business at and from its only plant in New Jersey. It conducted all of its manufacturing, purchasing and sales from that plant where all of its machinery, equipment, inventory, offices and business records were located. All of its banking business was done in Newark (with the exception of the one temporary account opened in New York in connection with the Ardisco closing). As argued by the Trustee, Lea Fabrics' creditors, in doing business with Lea, would undoubtedly and reasonably assume that they would be subject to and protected by the laws of the State of New Jersey and no other state. Consequently, the law which should be applied to the validity of the assignment of the intangible collateral to Ardisco is that of New Jersey, and N.J.S.A. 14:14–2 therefore governs the validity of the transfer of these intangibles on May 31, 1957. Irving Trust Co. v. Maryland Casualty Co., 2 Cir. 1936, 83 F.2d 168; G. P. Farmer Coal & Supply Co. v. Albright, Ch. 1919, 90 N.J.Eq. 132, 137–138, 106 A. 545. There is no question that R.S. 14:14–2 governs the transfer of both tangible and intangible assets of a corporation, Sokol v. Fidelity Union Trust Co., E. & A. 1946, 138 N.J.Eq. 429, 48 A.2d 207, and also that it applies, pursuant to R.S. 14:15–2, to foreign corporations such as Lea Fabrics, doing business in New Jersey, Agnew Co. v. Paterson Board of Education, Ch. 1914, 83 N.J.Eq. 49, 55, 89 A. 1046, affd. E. & A. 1914, 83 N.J.Eq. 336, 339, 90 A. 1135.

■■■ If New Jersey law would govern the validity of the assignment of the collateral, with respect to creditors, what effect should be given to the stipulation in the loan agreement that it and the loan "shall for all purposes be covered by and construed" under New York law? Al-

---

**3.** The license rights in the cartoons, the accounts receivable, the Storm-Vulcan debt and real and chattel mortgages securing the same, and the realty and maritime mortgages all constitute intangible movables for the purpose of the choice of appropriate law.

though this provision could be construed as stipulating the law applicable only to the agreement and not to the assignment of the collateral, In re Rosen, supra, 157 F.2d p. 999, even if this provision be construed as directing the application of New York law to the validity of the assignment of the intangibles, both New Jersey and Federal conflicts rules would make such a stipulation ineffective because it violates the public policy of New Jersey whose law would otherwise govern. Sonotone Corporation v. Ellis, Ch. 1949, 2 N.J.Super. 419, 423, 64 A.2d 255, affd. App.Div.1949, 4 N.J.Super. 331, 67 A.2d 186; Lobek v. Gross, 1949, 2 N.J. 100, 65 A.2d 744; Fricke v. Isbrandtsen Company, D.C.N.Y.1957, 151 F.Supp. 465, 468; 6A Corbin on Contracts, § 1446, p. 487. The validity of a contract is governed by the law chosen by the parties, unless the use of the chosen law would be contrary to a fundamental policy of the state whose law would govern in the absence of an effective choice by the parties, Restatement Second, Conflict of Laws, Tentative Draft No. 6, April 1960, § 332a. N.J.S.A. 14:14–2 discloses New Jersey legislative policy to prevent transfers of an insolvent corporation's assets in fraud of creditors by declaring such transfers null and void as to creditors. This statute is a clear expression of a fundamental policy of New Jersey, which cannot be circumvented by a stipulation of another state's law as applicable. Consequently, the loan agreement provision, making New York law the governing law, is ineffective, at least insofar as the validity of the transfer of the collateral as regards creditors is concerned, and that issue is governed solely by N.J.S.A. 14:14–2.

 There was substantial evidence before the Referee that on May 29, 1957 when Lea, Ardisco, Reldan and Stratford entered into the agreement for participation in the $1,100,000 loan to Lea, and on May 31, 1957 when the lending transaction was "closed" Lea was insolvent to the actual or imputed knowledge of all of the loan participants in whose behalf Ardisco acted in the transaction. The transfer of Lea's equities as collateral for the loan completed Lea's financial ruin, while only an insignificant portion of the ostensible amount of the loan found its way into Lea's treasury for application to its continually mounting liabilities to other creditors. Insolvency within the meaning of the New Jersey statute denotes a general inability on the part of a corporation to meet liabilities as they mature by means of either available assets or an honest use of credit. In re Nizolek Furniture and Carpet Co., D.C.N.J.1947, 71 F.Supp. 1012, 1016, affd. 3 Cir. 1948, 165 F.2d 788; Schwartz v. Maguire, E. & A. 1942, 131 N.J.Eq. 578, 25 A.2d 920. By this definition, Lea was insolvent at the time of the Ardisco loan transaction. Hoover Steel Ball Co. v. Schafer Ball Bearings Co., Ch. 1918, 89 N.J.Eq. 433, 437–440, 105 A. 500.

On May 31, 1957, when the criticized transfers were made, Ardisco had knowledge of the following facts: the real estate of Lea Fabrics was encumbered by three mortgages, in amounts aggregating $981,200, and its chattels by three mortgages in amounts aggregating $457,500. All of these mortgages were held by money lenders; two of the real estate mortgages and two of the chattel mortgages were held by Reldan Trading Corporation. All of the acceptable accounts receivable had been pledged to Inland Credit Corporation, Ardisco's affiliate, under an arrangement inferably brought about through the collaboration of representatives of Reldan, Fassoulis, Ardisco, Inland and Lea. Lea's books had been inspected by Inland's representative in connection with the accounts receivable financing. Lea was compelled to pay prohibitive interest rates for the use of money, e. g., 5½% per month on its $365,000 obligation to Reldan. For a relatively small cash receipt for itself, Lea was compelled to pay a bonus of $145,000, an interest rate of 6% on its assumed principal obligation of $1,100,-000, and to permit Ardisco to receive collections on the loan without applying them in reduction of principal. The loan

closing stripped Lea Fabrics of its remaining equities, except for its inventory, with which to meet obligations of corporations other than Lea Fabrics. The preferred maritime mortgage taken by Ardisco as part of the loan collateral, and recorded two days *prior* thereto, recited that it was second only to a first mortgage held by the United · States, whereas it was also subject to a second, unrecorded mortgage held by Reldan Trading Corp. and Stratford Factors. The law amply warranted the Referee in holding that notice of the foregoing facts constituted notice of the debtor's insolvency. Karkus v. Siefert, D.C.N.J.1958, 169 F.Supp. 662, affd. 3 Cir. 1958, 263 F.2d 333. See also Sokol v. Fidelity Union Trust Co., E. & A. 1946, 138 N.J. Eq. 429, 48 A.2d 207; Puritan Corp. v. Gannon, Ch. 1930, 106 N.J.Eq. 503, 151 A. 283; Hays v. Darden, 10 Cir. 1960, 284 F.2d 932.

The transfer of Lea's assets, including all the intangibles and tangibles transferred to Ardisco on May 31, 1957 (neither party attacks the Referee's finding that the transfer of the tangibles was void), was, under the circumstances, void within the meaning of N.J.S.A. 14:14–2. Consequently, the Referee's finding that only the transfer of the tangibles located in New Jersey was void, and paragraph 3 of his Order For Judgment of June 28, 1963 based thereon, are reversed, and judgment should be entered that the transfer of all the assets, tangible and intangible, to Ardisco on May 31, 1957, was void under N.J.S.A. 14:14–2.

■ The Referee's Order of June 28, 1963 failed to direct return to the Trustee of $8,435.83, the proceeds of the sale by Ardisco in 1958 of surplus machinery and equipment of Lea, which were located in New Jersey and included in the chattel mortgage given to Ardisco pursuant to the 1957 loan agreement. The Referee's Order directed Ardisco to repay to the Trustee the proceeds of sale of the remaining mortgaged chattels, held after Lea's bankruptcy petition had been filed; the $8,435.83 represents proceeds of the sale of chattels held before the petition

was filed. The Referee's Order failed to direct repayment of the $8,435.83 upon the ground that these chattels were never *in custodia legis* and that the Referee lacked personal jurisdiction over Ardisco. Not only did Ardisco fail to plead such lack of jurisdiction in its answer to the Trustee's counterclaim, but, by petitioning the Bankruptcy Court for relief, Ardisco waived any right to have a plenary trial on the Trustee's related counterclaim. In re Solar Manufacturing Corporation, 3 Cir. 1952, 200 F.2d 327, cert. den. Marine Midland Trust Co. of New York v. McGirl, 1953, 345 U.S. 940, 73 S.Ct. 831, 97 L.Ed. 1366; 2 Collier on Bankruptcy, Para. 23.08. Therefore the Referee's Order of June 28, 1963 should be modified by adding to paragraph 2 thereof a direction that Ardisco repay to the Trustee the $8,435.83 with interest.

In the light of the foregoing, it is unnecessary to consider the Trustee's remaining grounds for review of the Referee's findings and Order.

Ardisco seeks review of the Referee's decision on the basis of the following contentions:

(1) Lack of basis in law or fact for the Referee's conclusion that the chattel mortgage, dated August 29, 1956, given by Lea to Reldan, was extinguished by merger or payment.

(2) Lack of evidence that Reldan, a participant with Ardisco in the "loan" to Lea, was aware of the past and prospective looting of the bankrupt's assets by Fassoulis.

(3) Such knowledge of Fassoulis' looting as Reldan may have had was not imputable to the other "loan" participants.

(4) The loan participants' knowledge of the bankrupt's insolvency did not impair the validity of the "loan" transaction.

■ (1) On August 29, 1956, after he had gained control of Lea, Fassoulis induced Lea to acquire license rights in 179 Lantz cartoons and in contracts for the exhibition of these cartoons on television. He procured from Reldan an ad-

vance of $364,915.42, at 5½% *per month* interest on the successively outstanding balances on that loan. As collateral for that advance, Reldan received an assignment of all of Lea's rights in the cartoons, together with second mortgages on Lea's realty and on Lea's machinery and equipment. By May 31, 1957, when the Ardisco "loan" was closed, Lea still owed Reldan $205,000 on Reldan's August 29, 1956 advance. Lea had paid Reldan, for no apparent business reasons, a total of $176,964.52 during the period October 22 to November 14, 1956. Fassoulis caused Lea to acquire, on November 19, 1956, all of the stock of Storm-Vulcan Inc., for $235,000.00 in cash. In connection with that transaction, Reldan took chattel and realty mortgages from Storm-Vulcan and from Lea on the same date. Lea's contribution to the collateral which Reldan acquired in the Storm-Vulcan stock acquisition consisted of a third chattel mortgage for $35,000.00 on Lea's machinery and equipment and a second realty mortgage for $235,000.00. Thus Reldan acquired mortgage liens on the same chattels and realty of Lea upon which it had acquired prior mortgage liens on August 29 of the same year. Out of the proceeds of the Ardisco "loan", $205,000 was paid by the participating lenders directly to Reldan, in payment of the balance due to Reldan from Lea on Reldan's advance of August 29, 1956 in connection with Lea's Lantz cartoon acquisition. The Referee rightly concluded that the chattel mortgage given by the bankrupt to Reldan Trading Corp. on August 29, 1956, as a portion of the collateral for a loan of $364,000.00 (bearing interest at 5½% per month) became merged in the chattel mortgage given to Ardisco, Ltd. by the bankrupt on May 31, 1957, as collateral for Ardisco's loan (ostensibly of $1,100,-000) of that date, through Reldan's assignment to Ardisco of the earlier mortgage as additional security for the Ardisco loan (in which Reldan was a senior participant and of the proceeds of which Reldan was a substantial beneficiary.) At the time of the "closing" of the Ardisco loan, May 31, 1957, the balance due

from the bankrupt to Reldan under the earlier (August 29, 1956) mortgage had been reduced to $205,000.00, and that balance was paid to Reldan out of the proceeds of the Ardisco loan of May 31, 1957. It follows that (1) the earlier mortgage to Reldan was merged in the later mortgage to Ardisco through Reldan's assignment of the former to Ardisco as part of the collateral for the Ardisco loan of May 31, 1957; but, if such merger did not result, (2) the earlier mortgage was paid out of the proceeds of the loan in connection with which it was assigned to the ostensible lender as part of the collateral.

To support its contention that the earlier mortgage was not extinguished by merger, payment or otherwise, Ardisco points to the expressed provision of the written "Loan Agreement" of May 29, 1957 that the earlier chattel mortgage shall constitute a portion of the security for the new debt (to be) created on May 31, 1957 as a basis for the rebuttal of the presumption of merger. See Gimbel v. Venino, Ch. 1944, 135 N.J.Eq. 574, 576, 39 A.2d 489. Although equity does not generally favor mergers, it will not refuse to recognize a merger or extend the life of a security where to do so would effect a wrong upon innocent parties, such as the creditors of the mortgagor (bankrupt in this case). Andrus v. Vreeland, Ch. 1898, 29 N.J.Eq. 394; Pitroni v. Giacomo, E. & A. 1936, 119 N.J.Eq. 530, 534, 182 A. 845. The equities of the bankrupt's innocent creditors must prevail over the claims of the manipulator (Fassoulis) and his collaborating loan-participants, Reldan, Ardisco and Stratford. The Referee was equitably correct in refusing to disturb the presumption of merger of the mortgage upon which Ardisco relies. The Referee's finding that the August 29, 1956 mortgage had been paid is a reasonable inference from substantial evidence before him.

The security afforded thereby to Reldon on May 31, 1957 was for payment of the balance of $205,000 remaining due upon its original advancement of approximately $365,000.00 on August 29, 1956, for bankrupt's acquisition of the Lantz car-

toon assets. In the "Statement of Facts" set forth in its brief on its pending petition of appeal, Ardisco says (p. 3j.), "At a hearing held early in the proceedings, Lesser on behalf of Ardisco identified two chattel mortgages received by Ardisco as part of the loan security. * * * One mortgage encumbered the bankrupt's tangible personalty and had been executed by bankrupt to Reldan on August 30, 1956 and recorded on the same day. * * * Reldan at the time of the Ardisco loan assigned its interest [then only $205,-000.] in this mortgage to Ardisco and it became additional security for the loan. At that time, Reldan received the balance due on its debt of $205,000 from the loan proceeds." Payment of the mortgage indebtedness is thus conceded.

The mortgagor, Lea Fabrics, could have required Reldan to deliver up the mortgage for cancellation of record. The document had become ineffective as evidence of a lien. Its assignment to Ardisco by Reldan was a futile act, which did not and could not effect a pledge of nor impose a lien upon the mortgagor's chattels. Irrespective of the provisions of the loan agreement, Ardisco acquired no right, title or interest in the chattels covered by the 1956 Reldan mortgage. A fortiori Ardisco has no right to any of the proceeds of the receiver's sale of those chattels. The lien of the chattel mortgage given by Lea to Reldan as collateral for that advance was merged in the lien of the mortgage given by Lea to Ardisco on May 31, 1957 through Reldan's simultaneous assignment of the August 29, 1956 mortgage to Ardisco. The chattel mortgage to Reldan was therefore paid and merged. Its lien and the mortgagee's interest in the mortgaged chattels was thus extinguished. The Referee is affirmed in so finding.

(2) Ardisco's contention that the evidence lacks support for the imputation to Reldan of knowledge of Fassoulis' conceded looting of Lea's assets is unwarranted. The Referee found, and Ardisco tacitly concedes, that commencing with acquisition of control of Lea by Fassoulis and the installation of Fassoulis' puppets as directors of Lea, assets of Lea were being diverted to payment of indebtedness of Fassoulis' other "vestpocket" corporations. See similar pattern of conduct by Fassoulis in United States v. Fassoulis, 2 Cir. 1961, 293 F.2d 243. Ardisco argues that payments totalling $176,964.52, made by the bankrupt to Reldan during the period October 22 to November 14, 1956, were improperly found by the Referee to have been made neither in the ordinary course of bankrupt's business nor on account of obligations owed to Reldan by the bankrupt. It is conceded that these payments were not for inventory, machinery, equipment or plant maintenance, but claimant suggests that the disbursements in question were repayments on account of loans made by Reldan. The Trustee points out that "Reldan had been doing business with Fassoulis for many years involving numerous transactions with a number of his companies." Shortly after Fassoulis acquired control of the bankrupt, he turned to Reldan for cash to finance Lea's acquisition of the Lantz cartoon asset. As security for its advance of $365,000.00 for that purpose, Reldan was given (1) the exhibition license rights, the accrued receivables thereunder, the capital stock of the owner of the cartoons, a guarantee from their distributor, a guarantee from one Matthew Fox, a second mortgage on the chattels and a second mortgage on the real estate of bankrupt. Despite the risk-free amplitude of this security, Lea entered into a side agreement to pay 5½% per month for the use of the money. Reldan was next called in by Fassoulis to finance Lea's Storm-Vulcan stock acquisition. Despite the availability of Lea's own free cash for the purpose, Fassoulis caused Lea to mortgage its own chattels to Reldan for $35,000. Reldan and Stratford Factors had advanced moneys to Fassoulis' Whitehead Steamship Corporation to enable it to purchase the liberty ship, S.S. HAROLD D. WHITEHEAD, from Fassoulis-controlled Shipping Corporation of America. Both Shipping Corporation and Whitehead Steamship were

indebted to Reldan, and between January and May 1957, junior mortgages on the vessel were given to one Seaman as trustee for Reldan and Stratford Factors. Out of the proceeds of the Ardisco loan the bankrupt paid Reldan and Stratford $333,350.50, although the testimony disclosed that the maximum amount of Shipping Corporation's indebtedness to Whitehead Steamship was between $160,000 and $170,000. The Referee found that Lea made payments to Reldan totalling $232,000 between October 1956 and March 1957, which were not related to the operation of Lea's business, and the Referee appropriately inferred from the foregoing facts that the payments were not made to satisfy obligations incurred by Lea. The cash book of Lea, which purports to record all receipts and disbursements by Lea, discloses that Lea's payments to Reldan greatly exceed its receipts from Reldan. The most obvious inference suggested by the foregoing evidence is that Fassoulis was "bleeding" Lea with the knowledge and cooperation of Reldan. Ardisco's second ground for reversal of the Referee's order disappears.

(3) Ardisco concedes, as the Referee found, that the loan participants were joint adventurers, Kurth v. Maier, E. & A. 1943, 133 N.J.Eq. 388, 31 A.2d 835, and that "knowledge on the part of one joint adventurer is notice to all of them." Ardisco insists, however, that such knowledge, to be so imputable, must be "within the scope of the common enterprise. Knowledge by Reldan of the improper diversion of Lea's assets and the imminence of its financial collapse," says Ardisco, "was obtained from two to seven months prior to the time of the loan transaction on matters not related thereto" and is therefore not imputable to all of the participants in the loan unless it affects the joint enterprise. Fassoulis' prior course of looting of Lea, and Lea's progressive financial deterioration were highly relevant to and directly affected the joint loan participation. The evidence amply supports the Referee's finding of looting and insolvency, and of the

imputed knowledge thereof on the part of the loan participants.

(4) We cannot agree with Ardisco's final contention that the existence of knowledge of bankrupt's insolvency on the part of the loan participants does not affect the validity of the loan transaction. Such a contention is clearly inconsistent with the language of N.J.S.A. 14:14–2, upon which the Referee's decision is based. The statute expressly prohibits assignment or transfer of any real or personal property of an insolvent corporation, and renders any such assignment or transfer void as against creditors, "except that a bona fide purchase for a valuable consideration, before the corporation shall have actually suspended its ordinary business, by any person without notice of such insolvency * * * shall not be invalidated or impeached." For the "origin, history and interpretation" of this statute we are referred by the present petitioner to Havens v. Mohme Aero Engineering Corporation, Ch. 1944, 135 N.J.Eq. 386, 38 A.2d 108. That case held that diminution of the corporate assets by the transfer was a criterion of the invalidity of the transaction, because without such diminution of assets no preference would result and no violation of the statute occur. See also Miller v. Gourley, Ch. 1903, 65 N.J.Eq. 237, 55 A. 1083. While a "corporation may, if temporarily in need of funds, pledge its assets, if by the pledge of such assets moneys may be raised which will relieve it of its embarrassment and permit it to continue, * * * it must appear, before a corporation insolvent, in the sense of laboring under a general inability to pay maturing obligations, can make, for a present advance, a valid pledge of its assets to a person having knowledge of the condition, that the pledge is in pursuance of some financial scheme which it is reasonable to suppose will result in placing the corporation in a position of solvency as contemplated by the statute." Hoover Steel Ball Co. v. Schafer Ball Bearings Co., supra, 89 N.J. Eq. 437–438, 105 A. 502. The pledge of assets of Lea to Ardisco as collateral for

the loan of May 31, 1957 was clearly not in pursuance of a financial scheme which it was reasonable to suppose would place Lea in a position of solvency as contemplated by the statute. On the contrary, the loan transaction was in furtherance of a scheme to apply Lea's assets to the reduction of obligations of other corporations in which Fassoulis was financially interested. The pledge was void as against Lea's creditors. Cope v. C. B. Walton Co., Ch. 1910, 77 N.J.Eq. 512, 521, 76 A. 1044, affd. E. & A. 1911, 79 N.J.Eq. 165, 80 A. 473. Both of the mortgages upon which Ardisco relies to support its claim for the proceeds of sale of the mortgaged chattels are void as against the Trustee under N.J.S.A. 14:-14–2.

Ardisco's petition for review is, therefore, denied.

Having affirmed the Referee's determination that the transfers of collateral made by Lea to Ardisco on May 31, 1957 were void under N.J.S.A. 14:14–2, we address ourselves to the contention of Lea's Trustee in bankruptcy that the Referee erred in denying the prayers for affirmative relief in his counterclaim to Ardisco's motion for payment of proceeds of sale of physical assets of the bankrupt under foreclosure of its chattel mortgage to Ardisco of May 31, 1957. In his said counterclaim the Trustee seeks a declaration (1) that the transfers of all of the collateral made by Lea to Ardisco on May 31, 1957 be declared null and void, and that said collateral or the reasonable value thereof at the time of transfer, be returned to the bankrupt estate by Ardisco, with interest and costs; (2) that payments totalling $954,471.99 alleged to have been received by Ardisco on account of Lea's $1,100,000 obligation to Ardisco be paid over to the Trustee with interest and costs; and (3) that there be paid to the Trustee the sum of $382,301.99 constituting an over-payment received by Ardisco on account of the real indebtedness of Lea in the sum of $572,170.00 in connection with the purported loan of $1,100,000.00.

The Referee concluded that the sole issue presented was whether or not the 1957 transfer of Lea's collateral to Ardisco was void under N.J.S.A. 14:14–2. The Referee answered this question in the affirmative, but only with respect to Lea's tangible assets which had a situs in New Jersey at the time of the transfer. Accordingly, the Referee's order of June 28, 1963 denied the petition of Ardisco for a turn-over by the Trustee of the proceeds of the public sale of bankrupt's chattel mortgaged machinery and equipment, and directed repayment by Ardisco to the Trustee of the sum of $75,000.00, without interest, which had been paid to Ardisco out of the proceeds of the sale which the Trustee had previously been authorized to pay to Ardisco. Except as aforesaid, the order denied the relief sought by the Trustee in his counterclaim.

In the light of my holding that the transfer to Ardisco in May, 1957 of *all* of Lea's assets, tangible and intangible, was void, there remains for determination the measure and scope of recovery which the Trustee may have under his counterclaim for the void transfer of all the intangible assets. This determination may involve questions of law not briefed or argued here, see e. g. Schwartz v. Maguire, E. & A. 1942, 131 N.J.Eq. 578, 583, 25 A.2d 920, and additional findings of fact and of law by the Referee in regard to this limited issue. Although it seems unlikely in view of the voluminous record in this case, it may also be necessary for the Referee to take further testimony or receive additional evidence on this issue. Accordingly the case will be remanded to the Referee for proceedings not inconsistent with this opinion.

## APPENDIX

### A–I. THE REFEREE'S FINDINGS OF FACT

"1. Prior to July 6, 1956 there was trading in the stock of Lea Fabrics, Inc. in the over-the-counter market; and the controlling interest was acquired by Financial Consultants and Whitehead Steamship Corp. Whitehead Steamship

was the wholly owned subsidiary of Financial Consultants. 75% of the stock of Financial Consultants was held by Satiris Fassoulis. On July 6, 1956, Satiris Fassoulis took control of Lea Fabrics, Inc.

"2. On that date Lea was in sound shape from a balance-sheet viewpoint. Although it had debts of approximately $177,000.00, representing current liabilities, it had over $935,000.00 in liquid assets; and there were no liens on its realty, machinery & equipment, inventory or accounts receivable. From a profit & loss standpoint, however, Lea was in bad shape. It had lost its market for automobile carpets in 1954, and its efforts to diversify since then had been unavailing. It had lost money in operations since 1954; and it continued to have operating losses of at least $50,000.00 per month thereafter.

"3. Fassoulis, through his control of the directors, installed a slate of officers who were not qualified in the fields in which Lea was then attempting to operate, but who were complaisant enough to do his bidding. Fassoulis then commenced to use the assets, income and credit of Lea for his own purposes. These purposes were contrary to the interests of Lea.

"4. The first step taken by Fassoulis was on or about the date of his take-over of Lea. At that time Whitehead Steamship Corporation owned the stock of Shipping Corporation of America which in turn owned the S.S. Harold D. Whitehead. Fassoulis caused Whitehead to sell the stock of Shipping Corporation of America to Lea, for which Lea made cash payments totalling $552,952.24. On or shortly prior to May 29, 1957, and at a time when Whitehead was already indebted to Lea for over $700,000.00, Fassoulis had Lea re-transfer the stock of Shipping Corporation of America to Whitehead. In connection with the re-transfer, Lea received a second preferred maritime mortgage for $500,000.00 on the S.S. Harold D. Whitehead. At this time, such a second preferred maritime mortgage had no saleable value. Lea never benefitted financially from its ownership of the stock of Shipping Corporation of America between July, 1956 and May, 1957.

"5. On August 2, 1956 Fassoulis caused Lea to give Harry Schein a first mortgage of $57,500.00 on its machinery and equipment in connection with a loan of $50,000.00 to Lea. This mortgage obligation carried interest at 6% per annum, and $51,500 was due thereon on May 31, 1957.

"6. On August 13, 1956, by arrangement with Fassoulis, Morton Wasserman loaned Lea $350,000.00 for which Lea gave a first mortgage of $381,200.00 on its realty, payable February 13, 1957. Lea was unable to pay this mortgage on its due date, and paid $38,120.00 for a one-year extension of time, with a proviso that Lea would commence reducing the principal by at least $6,000.00 per month in the interim.

"7. On August 29, 1956 Fassoulis arranged for an advance of $364,915.42 by Reldan Trading Corp. in a transaction whereby Lea acquired license rights in 179 Lantz cartoons and in contracts for the exhibition of these cartoons on television. In return, Reldan received as collateral all of Lea's rights in the cartoons plus second mortgages on Lea's realty and on Lea's machinery and equipment. At the same time, Lea agreed to pay 5½% per month interest to Reldan on the outstanding balance of the advance. A company controlled by Harry Schein became an equal participant with Reldan in this Lantz cartoons venture. Lea never received any cash income from this venture, and the 'paper income' was not sufficient to pay the interest to Reldan and the other charges to which Lea was obligated by the arrangement. On May 31, 1957 $205,000.00 was still due to Reldan on its advance.

"8. On October 22, 1956 Lea paid $101,964.52 to Reldan Trading Corp. On November 8, 1956 Lea paid $50,000.00 to Reldan, and on November 14, 1956 Lea paid $25,000.00 to Reldan. These payments were not made in the ordinary course of Lea's business nor were they payments on account of obligations then owed to Reldan by Lea.

"9. On November 19, 1956 Fassoulis caused Lea to acquire 100% of the stock of Storm-Vulcan, Inc. for $235,000.00 cash in a transaction which resulted in the acquisition by Reldan of these four mortgages: a chattel mortgage for $95,-000.00 on the assets of Storm-Vulcan, Inc.; a realty mortgage for $35,000.00 from S–V Realty, Inc; (3) a third chattel mortgage for $35,000.00 on Lea's machinery and equipment; and (4) a second mortgage for $235,000.00 on Lea's realty. Fassoulis had Lea pledge the stock of Storm-Vulcan, Inc. to Milton Seaman as trustee for a Mr. Weinstock on a loan of $250,000.00. In March, 1957 Storm-Vulcan, Inc. defaulted on the 10% per annum interest due on its note (secured by mortgages) to Reldan and $98,000.00 was due thereon on May 31, 1957.

"10. In the early part of 1957 Ardisco, Ltd. and Inland Credit Corporation used the same offices and the same employees. The president, director and principal stockholder of Ardisco, Ltd. was the president, director and principal stockholder of Inland Credit Corporation. The officers of Ardisco were officers of Inland. About March 1, 1957 Benjamin C. Cohen, president of Reldan, introduced Fassoulis to Oscar Dane, Esquire, president of both Ardisco and Inland, as a prospective borrower. Thereafter, Fassoulis caused Lea to enter into an agreement with Inland to borrow money on accounts receivable. On March 12, 1957 Lea made its initial pledge of receivables to Inland and received $101,278.30 which it deposited in the National Newark & Essex Banking Company where the balance in its account was then $996.16. On that same date Lea drew checks to Reldan totalling $55,-170.66. These payments were not on account of the obligations owed to Reldan by Lea nor did they relate to the business of Lea.

"11. Reldan and Stratford had done business with Fassoulis prior to his takeover of Lea. They should have been cognizant of his penchant for disregarding the separate entities of corporations he controlled to the extent of paying the obligations of one with funds of another. Prior to May, 1957, Reldan knew as a fact that Fassoulis was using assets and income of Lea (a publicly held company) to pay debts of corporations such as Whitehead which were nothing more in truth than his own aliases.

"12. Commencing in February and continuing through May, 1957 Lea was in default on many of its trade obligations, and many creditors were pressing for payment. Soon the office staff of Lea was forced to divert its time and effort to the never-ending task of placating creditors, many of whom put Lea on a cash basis for future deliveries. Through use of false credit information, and in three or four instances by giving notes, and in still other instances by optimistic talking, Lea was able to forestall suits and, occasionally, to get further credit. Commencing in the middle of May, Lea's regular bank account showed continual overdrafts. In the latter half of May Lea's current obligations exceeded $500,000.00. All of its assets except inventory were burdened by liens. Lea was still losing money at the rate of at least $50,000.00 per month. Because of the slim margin of profit in its operations, sales would have to increase four-fold to eliminate losses. The official forecast at Lea for the period of June to December of 1957 was for a continuance of the losses.

"13. On or prior to May 29, 1957 it was arranged between Lea (represented by Fassoulis), Ardisco, Reldan and Stratford that Lea would execute a mortgage to Ardisco, Ltd. for $1,100,000.00 collateralized by all the equities then remaining in all of its assets except inventory. $145,000.00 would constitute the bonus.

"14. Ardisco, Reldan and Stratford agreed that they would make the following contributions to constitute the full sum of $955,000.00 to be advanced: Ardisco 33⅓% ($318,333.33), Reldan 53⅔% ($512,516.67), and Stratford 13% ($124,150.00). The agreement is in writing and it does not permit Ardisco to take any action in managing and administering the loan except with the consent of Reldan. Furthermore, Ardisco is not allowed any compensation for its services,

but certain fees are allowed to a company associated with Reldan.

"15. The mortgage loan was consummated on May 31, 1957. Ardisco issued nine checks for a total of $1,005,000.00. ($50,000.00 of this amount, representing a portion of the bonus, was returned to Ardisco on June 3rd together with $1,-000.00 for the use of the $50,000.00.) One of the nine checks in the sum of $205,000.00 was payable directly to Reldan for the balance remaining due to Reldan on the Lantz cartoons transaction. The remaining eight checks were made payable to Lea and were distributed as follows: two checks, for $1,158.67 and $14,718.20 respectively, representing interest due, were endorsed by Lea to Reldan; two checks, for $103,000.00 and $50,000.00 respectively, were endorsed by Lea to Whitehead Steamship Corporation which in turn endorsed both checks to Reldan; a check for $98,000.00 was endorsed by Lea to Storm-Vulcan, Inc. which in turn endorsed the check to Reldan; a check for $131,530.50 was endorsed by Lea to Whitehead Steamship Corporation which in turn endorsed the check to Stratford; a check for $51,-500.00 was endorsed by Lea to Harry Schein in payment of the first chattel mortgage on Lea's machinery and equipment; and a check for $350,092.63 was deposited by Lea in its account at the New York Trust Company.

"16. At the close of business on June 6, 1957 the deposit of $350,092.63 had been reduced to $1,068.56, mainly by reason of the following disbursements: $200,000.00 to Lea's account at the National Newark & Essex Banking Co.; $51,000.000 to Financial Consultants and thence to Ardisco representing $50,000.00 of the bonus plus $1,000.00 for the use thereof; $25,000.00 to Storm-Vulcan, Inc.; and $23,000.00 to the New York Trust Co. to pay an obligation owed to the Chatham Company by Financial Consultants.

"17. As of May 31, 1957 there was an overdraft of $144,232.03 in Lea's account at the National Newark & Essex Banking Co. (In anticipation of the loan, Lea had written approximately $110,000.00 in checks to creditors.) Consequently most of the $200,000.00 transferred from the New York Trust Co. was applied against the overdraft. On June 3, 1957 $49,000.00 was sent to Stratford Factors to pay a debt of Shipping Corporation of America.

"18. At the closing on May 31, 1957 Reldan assigned to Ardisco the mortgage for $364,915.42 on Lea's machinery and equipment which it had received on August 29, 1956 as collateral security in connection with the transaction involving the Lantz cartoons. All of Lea's rights in the cartoons and the receivables were pledged to Ardisco at the closing; and, among the other collateral, was a chattel mortgage for $1,100,000.00 on Lea's machinery and equipment.

"19. In December, 1957 Ardisco sold to the F. L. Jacobs Company for $350,-000.00 all the remaining rights in the Lantz cartoons and receivables."

## A-I. THE REFEREE'S CONCLUSIONS OF LAW

The Referee made the following conclusions of law:

"The issues raised by the pleadings do not encompass the charges made in Points II and III of the Trustee's brief. The sole issue raised by the pleadings is whether or not the transfer of Lea's collateral to Ardisco is void under N.J.S.A. 14:14-2. The documents of the transaction were executed in New York, and the parties agreed that the law of New York should govern. Therefore, the attack by the Trustee in this proceeding is relevant only to the collateral having a situs in New Jersey.

"The chattel mortgage given to Reldan by Lea on August 29, 1956 lost its identity as a separate lien and became merged in the mortgage given to Ardisco by Lea on May 31, 1957. This merger occurred by reason of the assignment of the earlier mortgage to Ardisco by Reldan on the latter date. Had there been no merger, the earlier mortgage would have been satisfied on that date in December, 1957 when Ardisco received payment for its

rights in the Lantz cartoons, this earlier mortgage having been given as collateral security in connection with the Lantz Cartoons acquisition by Lea.

"Fassoulis had no interest in Lea other than to divert its assets for his own purposes. The officers he installed at Lea were there to do his bidding, not to act independently in the interests of Lea. Commencing in July, 1956 the only result reasonably to be contemplated for Lea was an eventual insolvency. The three senior participants in the Ardisco loan were joint adventurers, and the knowledge of each as to matters involved in the loan is imputed to all. The three senior participants were managed by astute business men, and their knowledge of the financial condition of Lea was far greater than that of the officers of Lea who simply acted at the behest of Fassoulis. Prior to May 31, 1957 Reldan knew that Fassoulis was looting Lea for the benefit of certain of his 'vest pocket' corporations. This knowledge was equivalent to knowledge that the only future reasonably to be contemplated for Lea was financial collapse. On or before May 29, 1957 Ardisco and Stratford should have known that Lea was foredoomed. On May 31, 1957 Lea was, to the knowledge of Ardisco, an insolvent corporation within the meaning of N.J.S.A. 14:14–2. Under this statute, the transfer of Lea's collateral having a situs in New Jersey to Ardisco on May 31, 1957 was void."

\* \* \*

Both the loan agreement between Ardisco and Lea dated May 29, 1957, and the participation agreement between Ardisco, Reldan and Stratford, dated May 31, 1957, were drawn by New York counsel, Parker, Chapin & Flattau, of 285 Madison Avenue, New York City.

#### A–II. ABSTRACT OF LOAN AGREEMENT

RECITALS: Lea indebted to Reldan for $250,000.00 on 18 months' registered note of MPTV Cartoons, Inc. (MVTV),

dated December 31, 1954 in original amount of $810,500.00, assumed by Lea and extended by Reldan pursuant to loan assumption agreement of August, 29, 1956. Ardisco acquires from Reldan the MPTV debt. Lea desires to extend the maturity of that debt and to borrow an additional $895,000. which Ardisco is willing to grant upon the terms and conditions of the agreement.

To induce Ardisco to enter into the agreement to acquire the MPTV debt from Reldan and to advance to Lea the additional moneys provided by the agreement, Lea warrants, *inter alia*, that it is solvent, has assets of a reasonable value at least equal to its obligations and is able to meet all of its obligations as they mature.

The note evidencing the MPTV debt is valid, has been duly assumed by and is the valid obligation of Lea for the unpaid balance thereof amounting to $205,000.00 and bears interest at the rate of 6% per annum.[1]

Lea has the exclusive right to distribute and license others to exhibit on television the "Walter Lantz Cartoons" until December 31, 1961. The actual distribution of the cartoons is being done by Guild Films Company, Inc., a Colorado corporation having its principal office at 450 Park Avenue in New York City, under a sublicense from Lea to Guild. All contracts relating to the exhibition of the cartoons, whether heretofore or hereafter entered into, and all proceeds therefrom,, with the exception of Guild's distribution fee of not more than 25% and not more than 6% payable to the American Federation of Musicians, were duly assigned to Reldan and by Reldan contemporaneously assigned to Ardisco.

In addition to the $205,000 balance due from Lea to Reldan on the MPTV Cartoons, Inc. indebtedness of $810,300.00, which was assumed by Lea and is assumed by Ardisco, Ardisco advances to Lea under this agreement $895,000.00 made up of $800,000.00 in cash and $95,-

---

[1]. Despite the recital of this 6% interest rate in the agreement, it appears elsewhere that Lea is obligated to pay Reldan interest on the unpaid balance of this indebtedness at the rate of 5½% per month!

000.00 in the form of a bearer note of Financial Consultants, Inc. (Fassoulis) delivered by Ardisco to Lea without warranty or recourse.[2]

As evidence of Ardisco's advance of $895,000.00 (cash and note), aforesaid, and of Lea's obligation on the MPTV debt, Lea gives Ardisco its promissory note for $1,100,000 with interest on successive unpaid balances at 6% per annum, payable monthly, beginning June 30, 1957.

COLLATERAL: In addition to all collateral already securing the MPTV debt, Lea transfers to Ardisco the Storm-Vulcan notes and the Storm-Vulcan mortgage (one note for $95,000 secured by Storm-Vulcan chattel mortgage, covering personal property in Dallas County, Texas, and the other note for $35,000 secured by promissory note for the same amount made by Storm-Vulcan Realty Company to the order of Storm-Vulcan, Inc. and endorsed to Reldan, secured by mortgage from Storm-Vulcan Realty Company to Sam W. French, Trustee, covering premises in Dallas County, Texas. [Despite the endorsement to Reldan, Lea warrants its ownership of this security.]).

Also, a $500,000.00 note of Whitehead Steamship Corp. to Lea secured by second preferred mortgage on the S.S. HAROLD D. WHITEHEAD, and all rights and benefits of Lea as assignee of existing and future charter parties covering the vessel, all net charter hire and net proceeds payable thereunder due and to become due from the operation of the vessel to which Lea is or may become entitled.

A chattel mortgage made by Lea to Ardisco covering machinery and equipment at Lea's premises 756–778 Frelinghuysen Avenue in Newark, and real estate mortgage covering the land and buildings at that address.

All rights and licenses owned or hereafter acquired by Lea for distribution, exhibition, or exploitation of the "Walter Lantz Cartoons" and all rights and benefits of Lea as assignee under license agreement of November 19, 1954 between United World Films, Inc. and MPTV Cartoons, Inc. and under separate letter of consent from United World Films to Lea, dated August 29, 1956, together with all sums of every nature due and to become due under all contracts existing or thereafter entered into for the television exhibition of the cartoons, less only the Guild's distribution fee not exceeding 25% and an additional 6% payable to the American Federation of Musicians.

The agreement contains the expressed intention that all rights, etc., with respect to the cartoons theretofore held by Reldan "shall, after payment in full of the MPTV debt continue to be held and owned by" Ardisco until the loan is paid in full, with full authority to Ardisco to dispose of the collateral without notice to Lea and subject to Lea's duty to remit to Ardisco all moneys received by Lea on any of the collateral.

All moneys received or realized by Ardisco shall be retained by it as cash collateral; it shall not be obliged to apply any portion thereof toward the payment of the loan.

Lea expressly agrees that by the end of each month and as long as any part of the loan is outstanding, Ardisco shall receive in cash or equivalent, not less than (1) $25,000 on account of the Whitehead note; and (2) $25,000 on account of the MPTV debt.

As a further inducement for the loan and in consideration of $5,000.00 paid by Ardisco to Lea, Ardisco purchases from Lea a warrant evidencing the right of bearer to purchase 100,000 shares of Lea's $5.00 par value common stock at $5.95 per share on or before August 31, 1958.

Default by Lea and its continuance unremedied for five days, or breach of any of Lea's warranties, or any proceeding

---

2. Despite this provision for payment of $800,000 cash to Lea upon this contract, only $207,092.63 ($350,092.63 deposit in N. Y. Trust Co. less payments out on account of debts of others totalling $148,-000.00, recited in the Referee's findings of fact) was actually received by Lea in the transaction.

under the Bankruptcy Act by or against Lea not dismissed within thirty days, or if a receiver is appointed for Lea and not discharged within thirty days, the loan and all other obligations of Lea to Ardisco then outstanding, and not already payable on demand, shall, at the election of Ardisco, become due and payable on demand, and Ardisco may sell all or any of the collateral, free from any equity or right of redemption of Lea, the proceeds to be held by Ardisco as cash collateral or applied by Ardisco toward the payment of the loan, and any other obligation owed by Lea to Ardisco, as Ardisco may determine. "Any surplus to be refunded to Lea and Lea to remain liable for any deficiency."

"This agreement and the loan shall for all purposes be covered by and construed in accordance with the laws of the State of New York."

* * *

## A–III. ABSTRACT OF PARTICIPATION AGREEMENT

Ardisco, Reldan and Stratford entered into a written participation agreement, dated May 31, 1957, expressly referred and related to the loan agreement above discussed.

The participation agreement recites that Financial Consultants, Inc. (Fassoulis) is contemporaneously acquiring from Ardisco a subordinated participation in the loan to the extent of $145,000., and Reldan and Stratford are contemporaneously acquiring from Ardisco a participation in the remaining $955,000.00 principal amount of the loan; and also an undivided interest in the stock warrant to purchase 100,000 shares of Lea's stock at $5.95 per share. The dollar and percentage participations are as follows:

Participation

| | In Loan | In Warrant | Percentage |
|---|---|---|---|
| Ardisco | $318,333.33 | $1,666.66 | 33⅓% |
| Reldan | 512,516.67 | 2,683.34 | 53⅔% |
| Stratford | 124,150.00 | 650.00 | 13% |
| Total | $955,000.00 | $5,000.00 | 100% |

The agreement further provides that an agreement of May 29, 1957 between Ardisco and Financial Consultants, Inc. postpones Financial Consultant's right to interest on its subordinated participation until the shares of the senior participants, principal and interest, are paid in full.

Promptly after receipt by Ardisco of interest on the loan, Ardisco shall pay 15% thereof to Cohen-Manheimer Corp. as its commission and remit to Reldan and Stratford their respective shares of the balance of the interest, Ardisco retaining for its own account its share of the balance of the interest. The interest on the subordinated participation of Financial Consultants shall be deemed and treated as part of the cash collateral for the loan.

Promptly after Ardisco receives any payment on account of principal, either from Lea or as proceeds of collateral actually applied against but not held as security for the loan, Ardisco shall remit to Reldan and Stratford their respective shares and retain its share for its own account.

Contemporaneously with the participation agreement under review, Ardisco entered into an agreement with Financial Consultants for the latter's purchase from Ardisco of the stock warrant aforesaid. 15% of any proceeds from the sale of that warrant over and above the cost thereof, shall be paid by Ardisco to Cohen-Manheimer Corp. as its commission, and the balance of the proceeds shall be distributed among Reldan, Stratford and Ardisco in proportion to their respec-

tive shares in the loan participation agreement.

Ardisco shall have the exclusive management and administration of the loan and all collateral therefor, as well as the warrant for stock purchase; but no such right or authority shall be exercised by Ardisco except with the approval of Reldan.

It is contemplated that some or all of the cash collateral that may from time to time be held by Ardisco under the loan agreement, shall be deposited with Reldan or Stratford or both, repayable on demand to Ardisco, without interest, and may be used by the party with whom deposited as its general funds until repaid.

The agreement further expressly provides that nothing contained therein shall be deemed to be a warranty by any of the parties respecting the validity enforceability or payment of the loan, or any collateral therefor.

If any claim or action is brought against Ardisco by Lea or any other party, based upon anything done by Lea in connection with the loan or any of its collateral, notice thereof shall be given by Ardisco to Reldan and Stratford, who shall share the cost of defense and any obligation of Ardisco to pay thereunder.

\* \* \*

## A–IV. ABSTRACT OF TRUSTEE'S COUNTERCLAIM TO ARDISCO'S MOTION FOR ORDER DIRECTING TRUSTEE TO TURN OVER FUNDS

COUNTERCLAIM FILED OCTOBER 7, 1960:

FIRST COUNT: Alleges loan by Ardisco on May 31, 1957 as joint venture with Reldan, Stratford and Financial Consultants. Prior loans of Reldan to Lea in large amounts at excessive interest rates, and subject to bonus charges, with persistence of indebtedness of Lea to Reldan, including one obligation bearing interest charges of 5½% per month.

Prior loans of large sums by Reldan to Fassoulis who controlled Lea, and to other corporations controlled by him, with persistence of indebtedness of Fassoulis and his other companies to Reldan.

Prior loans in large amounts to Lea, at excessive bonus and interest charges by Stratford and persistence of indebtedness by Lea to Stratford.

Prior loans of Stratford to Fassoulis and companies other than Lea which Fassoulis controlled, and persistence of indebtedness to Stratford by the borrowers.

Common control of Ardisco and Inland Credit.

Prior loans by Inland Credit to Lea at excessive interest and bonus charges, and persistence of that indebtedness.

Control by Fassoulis of Financial Consultants, which controlled Lea.

At the closing on May 31, 1957, Lea gave note for $1,100,000. and received $800,000 in checks and a bearer note for $95,000. of Financial Consultants, endorsed without recourse, by Ardisco.

At the closing, Ardisco gave check for $205,000 directly to Reldan.

Of the checks turned over to Lea, aggregating $800,000. it endorsed:

$51,500 to Schein *
$15,876.87 to Reldan
$98,000.00 to Storm-Vulcan **
$284,830.50 to Whitehead Steamship. ***

( *Schein is believed to be affiliated with Reldan.)
( **Storm-Vulcan endorsed its $98,000 check to Reldan.)
(***Whitehead Steamship endorsed $153,-000 of the moneys received from Lea to Reldan, and the remaining $131,-530.50 thereof to Stratford Factors.)

At the conclusion of this closing, Lea retained one check for $350,092.63 and a bearer note of Financial Consultants for $95,000.00. Lea used this sum of $350,092.63 to make the following payments:

$51,000 to Financial Consultants
$49,000 to Stratford Factors
$ 5,405.25 to Parker, Chapin & Flattau, for legal services rendered for Ardisco
$25,000.00 to Storm-Vulcan, and
$ 1,844.92 to Inland Credit.

Out of the proceeds of the "loan" Lea obtained for its use in paying its creditors, not more than $218,000.00. The $95,000 bearer note was never presented for payment or paid.

Paragraph 15 of the first count lists current liabilities of Lea at the time of the loan aggregating $533,951.45 exclusive of a number of other loans, mostly secured from non-banking lending institutions, totalling substantial sums of money at excessive interest rates. At the time of the Ardisco loan transaction Lea had only nominal liquid assets that were unreached and available to meet current liabilities; they consisted of $3,000 in cash and $30,000 in accounts receivable of companies other than those controlled by Lea or Fassoulis.

Of the $218,000.00 which Lea received out of the closing, $144,233.03 was required to meet an overdraft at National Newark & Essex Bank, Haynes Avenue Branch.

At the time of the closing, Reldan knew or had reason to know that Lea was insolvent and Stratford Factors, Inland Credit and Fassoulis had similar knowledge.

SECOND COUNT: Incorporates by reference the allegations of the first count and alleges that since May 31, 1957 Ardisco has received on account of the $1,100,000 obligation of Lea, payments totalling $954,471.99 and that it had knowledge of Lea's insolvency at the time of the receipt of each of these payments.

THIRD COUNT: Incorporates by reference the allegations of the first and second counts and further alleges that although Ardisco purported to lend Lea $1,100,000.00 it in fact did not lend Lea more than $572,170.00. $145,000 of the funds purported loaned to Lea constituted an alleged participation of Financial Consultants in the transaction and was made up of a bearer note of Financial Consultants and moneys totalling $50,000.00 which it obtained from the proceeds of the loan to Lea. The $95,000 bearer note was never presented for payment or paid to Lea. Financial Consultants was never

intended to be a genuine participant in the loan, and immediately after the closing it assigned its interest in this hypothetical participation to Ardisco. The $145,000 purporting to be the amount of Financial Consultant's participation in the loan was never intended to nor did it enure to the benefit of Lea. Ardisco's books carried the principal amount of the loan indebtedness at $955,000.00 consisting of a Stratford Factors participation for $124,150.00, Ardisco's participation for $318,333.33, and Reldan's participation for $512,516.67. Checks totalling $284,830.50 from Ardisco to Lea at the closing were thereafter endorsed to Whitehead Steamship and thence endorsed in part to Stratford Factors and to Reldan Trading. At the closing Ardisco knew that such disposition would be made of those checks. No consideration passed from Whitehead Steamship to Lea for the aforesaid payments and the loan participants, by virtue of their dealings with Whitehead Steamship, Lea and Fassoulis knew that Whitehead Steamship had not given any consideration to Lea for those payments and was incapable of doing so because it was insolvent. One of the items of collateral given by Lea to Ardisco at the closing was the assignment of an obligation of $500,000 owed *by* Whitehead *to* Lea. The Ardisco loan transaction was employed by Ardisco as a device with which to divert funds of Lea to the payment of outstanding obligations of Whitehead Steamship to Reldan and to Stratford Factors. Checks of Ardisco totalling $98,000 given to Lea Fabrics at the closing were thereafter transferred to Storm-Vulcan and thence to Reldan. Ardisco knew at the time these checks were drawn that they would be transferred by Lea to the named successive endorsees, without any consideration to Lea, and that they were intended to pay Storm-Vulcan's indebtedness to Reldan. By reason of the aforesaid the actual indebtedness of Lea on the Ardisco loan was no more than $572,170.00. Ardisco's receipt of payments totalling $954,471.99 constitutes an overpayment of Lea's real indebtedness

amounting to $382,301.99. In addition to this over-payment, Ardisco still holds a $95,000 chattel mortgage on property of Storm-Vulcan, a $35,000 real estate mortgage on property of Storm-Vulcan Realty Co., and on these indebtednesses interest has accrued approximating $30,-000.00.

The Trustee prayed at the foot of his counterclaim, that the amount of the aforesaid over-payment of $382,301.99 be paid to the Trustee, and that the chattel mortgage of Storm-Vulcan, Inc. and the real estate mortgage of Storm-Vulcan Realty Company or the fair value of both of these mortgages, be turned over to the Trustee with interest and costs.

On October 7, 1960 the Trustee amended his counterclaim in a few minor respects, substantially as follows: Paragraph 1 of the First count: On May 31, 1957 Ardisco as agent of and co-joint-venturer with Reldan, Stratford, Ardisco and Financial Consultants entered into a loan transaction with Lea Fabrics. Paragraph 5 of the first count was amended to allege that prior to May 31, 1957, Stratford had loaned substantial sums of money to Fassoulis and/or companies other than Lea that he controlled.

\* \* \*

A-V. ANSWER OF ARDISCO TO COUNTERCLAIM

The answer of Ardisco to the counterclaim of the Trustee admits that Financial Consultants was a participant in the loan agreement and gave the $50,000 cash and $95,000 bearer note alleged in paragraph 3 of the third count of the counterclaim. It admits that at the time of the closing, Ardisco knew that $284,-830.50 would be transferred by Lea to Whitehead Steamship, thence to Reldan and thence to Stratford Factors; and that it knew that the checks totalling $98,000 from Ardisco to Lea would be transferred by Lea to Storm-Vulcan and thence to Reldan. With respect to the allegation of accrued interest on the Storm-Vulcan and Storm-Vulcan Realty mortgages, which Ardisco still holds, it

alleges that the accrued interest exceeds $30,000.

As affirmative defenses, Ardisco pleads that the transaction was governed by the law of New York, under which it is completely valid; and that N.J.S.A. 14:-14–2 is inapplicable to enable the Trustee to recover collateral security which never had a situs in New Jersey, because the loan transaction was entered into and governed by the law of New York.