In re O.P.M. LEASING SERVICES, INC., Debtor.

In re CALI TRADING INTERNATIONAL, LTD., Debtor.

James P. HASSETT, as Chapter 11 Trustee of O.P.M. Leasing Services, Inc., and James P. Hasett, as Chapter 11 Trustee of Cali Trading International, Ltd., Plaintiffs,

v.

Daniel McCOLLEY, as Chapter 7 Trustee of Myron S. Goodman, Albert E. Reisman, as Chapter 7 Trustee of Mordecai Weissman, Federal Deposit Insurance Corporation, Louisiana National Bank of Baton Rouge, Rhode Island Hospital Trust National Bank, the Lincoln National Life Insurance Company, Westdeutsche Landesbank Girozentrale, the First National Bank of St. Paul, the Paul Revere Life Insurance Company, the Paul Revere Variable Annuity Insurance Company, Avco Corporation Retirement Income Trust and the Paul Revere Protective Life Insurance Company, Defendants.

Bankruptcy Nos. 81 B 10533, 81 B 11203. Adv. No. 81–5486A.

United States Bankruptcy Court, S.D. New York.

March 10, 1983.

Zalkin, Rodin & Goodman, New York City, for OPM/CALI; Henry L. Goodman, Harold N. Schwinger, Nadine S. Liebhardt, New York City, of counsel.

Rogers, Hoge & Hills, New York City, for Louisiana Nat. Bank; James Blair, New York City, of counsel.

## DECISION ON LOUISIANA NATIONAL BANK'S MOTION FOR SUMMARY JUDGMENT

BURTON R. LIFLAND, Bankruptcy Judge.

The centerpiece of this litigation is a fund of approximately $17 million representing the proceeds of the sale of the controlling interest of a National Bank in Louisiana. During the course of the litigation many of the parties have resolved their claims against the fund by stipulations, compromises or settlements, the details of which have no impact on this motion for summary judgment.

The controversy presently before the Court concerns 164,366 shares of common stock which represent an interest of approximately 52% of shares in the First National Bank of Jefferson Parish, Louisiana ("FNJ"). This stock was pledged as security for a loan secured by Myron S. Goodman ("Goodman") and Mordecai Weissman ("Weissman") from the Louisiana National Bank of Baton Rouge ("LNB").

## I. *The Pleadings and Instant Motion*

Through his amended complaint of November 12, 1981, James P. Hassett (the "Trustee"), acting as Chapter 11 trustee of both O.P.M. Leasing Services, Inc. ("OPM") and Cali Trading International, Ltd. ("Cali"), is seeking the turnover of the FNJ stock by LNB and the recovery of payments received by one or more parties including Daniel McColley, as Chapter 7 trustee of Goodman and Albert F. Reissman, as Chapter 7 trustee of Weissman, the Federal Deposit Insurance Corporation ("FDIC") and/or LNB. The complaint is based on alternative claims reflecting fraud, unfair consideration and constructive and purchase money resulting trusts.

Specifically, Part II of the amended complaint comprises the bulk of the pleading and alleges that Goodman and Weissman, both New York domicilliaries, each owned half of the shares of Cali which, in turn, owned all of the shares of OPM. The complaint further recites that Goodman and Weissman constituted the majority of the OPM and Cali Boards of Directors and its controlling officers, and in April 1978, while OPM and Cali were insolvent within the meaning of the Bankruptcy Code ("the Code") Section 101(26) and New York Debtor and Creditor Law §§ 270 *et seq.*, entered into negotiations to purchase, and indeed contracted to purchase from the FDIC, the controlling shares of stock in FNJ for $9.5 million. In addition, the complaint avers that the contract was entered into by Goodman and Weissman "d/b/a O.P.M. Leasing Services, Inc." and that the $1 million contract down payment was made with OPM funds.

Thereafter, the complaint continues, LNB officials came to New York to negotiate, and on July 18, 1978, made a loan agreement to finance Goodman and Weissman's purchase of the FNJ stock. LNB lent Goodman and Weissman $6 million secured by a pledge of the FNJ stock, with OPM and Cali guaranteeing repayment of the loan. Simultaneously with the closing of the loan agreement, the purchase of the FNJ stock from the FDIC closed by pay-

ment to the FDIC of an additional $2.5 million of OPM funds and the $6 million loaned by LNB. At that time, the Trustee avers, Goodman and Weissman admitted in writing that it was intended that Cali be the legal and beneficial owner of the FNJ stock.

Part III of the Amended Complaint is the first count and is directed against all defendants seeking to recover OPM's aggregate payments to all defendants from 1978 to March 11, 1981, the date when OPM filed in Chapter 11, of $8,428,358.76 as a fraudulent conveyance, under Code Section 544(b) and New York Debtor and Creditor Law §§ 270 et seq. This figure encompasses all expenses in acquiring the FNJ stock by Goodman and Weissman and in servicing the LNB loan. The Trustee contends, inter alia, that these payments were made without fair consideration at times when OPM was engaged in a business for which the property in its hands after such payments constituted an unreasonably small capital. Thus, he avers that these payments were fradulent as to then existing and future creditors. The Trustee also seeks to impress a resulting or constructive trust pursuant to, e.g., New York Estates, Powers and Trusts Law ("EPTL") Section 7–1.2 upon the stock in favor of OPM by reason of the breach of fiduciary duties of Goodman and Weissman to OPM as its directors and officers pursuant to New York Business Corporation Law ("BCL") Section 720(a)(2) and to require the Goodman and Weissman Chapter 7 trustees, pursuant to Code § 550(a), to transfer the stock or its proceeds to him free of the claims of any of the defendants, including LNB.

Part IV is the second count by the Cali trustee and is one for alternative relief against all defendants claiming the execution of a trust in favor of the OPM or Cali trustee in the pledge of stock or its proceeds based upon the facts pleaded in the other parts. The alternative third count (Part V, paragraphs 47–49) in favor of the OPM

trustee seeks to recover $3.5 million from the FDIC which OPM paid it directly to purchase the FNJ stock and $4,498,769.76 from LNB as fraudulent conveyances of OPM funds. This $4,498,769.76 amount represents OPM's principal and interest loan payments to LNB. The final alternative count (Part VI, paragraphs 50–52) on behalf of the Trustee against LNB seeks recovery of $1,676,808.37 paid to LNB with OPM funds within one year of the filing of OPM's Chapter 11 petition on March 11, 1981.

Defendant LNB moves pursuant to Rule 56 of the Federal Rules of Civil Procedure ("FRCP") as applied in bankruptcy matters by Rule 756 of the Rules of Bankruptcy Procedure [1] for summary judgment against the Trustee in his capacity as trustee of the OPM and Cali estates to dismiss the Amended Complaint insofar as it states claims against LNB. LNB's prior motion pursuant to Rule 12(b)(6) of the FRCP and Rule 712 of the Bankruptcy Rules to dismiss the amended complaint upon the ground that it fails to state a claim was denied by this Court on January 20, 1982.

LNB's answer and the Statements Under Local Rule 3(g) put into dispute the following issues: (1) the insolvency of Cali and OPM at the time the loan agreement was entered into; (2) LNB's actual or constructive knowledge that OPM and Cali were the true owners of the FNJ stock and that these corporations were insolvent; (3) that OPM's payments on behalf of Goodman and Weissman aggregating $8,428,358.76 constituted fraudulent conveyances; (4) that these payments were made without fair consideration at times when OPM was engaged in business for which the property remaining in its hands after such payments constituted an unreasonably small capital, thereby defrauding creditors; and (5) that these debts were incurred when Goodman and Weissman intended that OPM incur obligations beyond OPM's ability to repay.

---

1. The citation to Bankruptcy Rule 756 refers to one of the rules contained in the Rules of Bankruptcy Procedure, promulgated by the Supreme Court pursuant to 28 U.S.C. § 2075 for use under the Bankruptcy Code to the extent not inconsistent. See B.R.A. Sections 247, 402 and 405.

Moreover, LNB has asserted as affirmative defenses that Louisiana law applies and that the Trustee may not recover payments made by OPM to LNB under Code Section 544 because these transfers may not be avoided under Louisiana law, except upon a showing of bad faith by the transferee. LNB, of course, contends that it received payment in good faith. LNB also contends alternatively in its affirmative defenses, that recovery of payments received by LNB from OPM within one year of the filing of OPM's petition may not be had because the payments were not made with the intent to hinder, delay or defraud, and OPM received equivalent value in exchange therefore.

Accordingly, these defenses alone, which are deemed controverted, raise disputed fact questions going to the heart of the legal determination required of the Court herein.

## II. *Background Facts*

From affidavits relating, *inter alia,* deposition testimony, the following additional background has been ascertained by this Court. OPM, a New York Corporation, was engaged in the business of buying, selling and leasing new and old computer equipment. At all pertinent times, OPM has been a wholly-owned subsidiary of Cali, a holding company incorporated in New York. The issued and outstanding stock of Cali was owned entirely by Goodman and Weissman. In addition, Goodman and Weissman have always made up at least a majority of the Board of Directors of OPM and Cali. Singer, Hutner, Levine and Seeman, P.C. ("Singer Hutner") was the law firm that represented both OPM and Cali and Goodman and Weissman. *See* Opinion Letter to LNB dated July 26, 1978 from Singer, Hutner attached as Exhibit 7 to the Affidavit of Robert C. Sutton, Jr., a Vice President of LNB, sworn to October 18, 1982 (the "Sutton Affidavit"). Prior to the transactions at issue, Andrew Reinhard of Singer Hutner was a member of the Board of Directors of OPM and Cali. Two other members of Singer Hutner or an affiliated law firm acted as directors of FNJ. Both OPM and Cali are debtors in possession in proceedings before this Court. LNB, a national bank with its principal place of business in East Baton Rouge Parish, Louisiana, was fully aware of the above facts.

In a contract dated April 27, 1978, the FDIC agreed to sell the 164,366 shares of FNJ stock to Goodman and Weissman "d/b/a O.P.M. Leasing Services, Inc.," *See* Plaintiff's amended complaint, Exhibit 1. The purchase price was $9,500,000 of which $1,000,000 was to be put up in advance. The sum of $6,000,000 was to be financed by July 18, 1978 and the balance of $2,500,000 was to be paid at the closing which was to take place no later than July 31, 1978.

In April 1978, LNB officials were first contacted by Goodman and Weissman in New York concerning the possibility of a loan agreement between Goodman and Weissman and LNB to finance the FNJ stock purchase. Realizing that the proposed loan was greater than the applicable loan limit, LNB solicited and obtained the interest of Mercantile Bank of Dallas, Texas to participate in the proposed loan.

On April 25, 1978, Lee Griffin, then LNB's senior vice president and head of its equipment leasing subsidiary, John Munsell, LNB's loan officer and John Farmer of Mercantile Bank travelled to New York to meet with Goodman and other OPM representatives at the offices of OPM. They received 1976 and 1977 financial statements of Cali, which included OPM's data and financial statements for Goodman and Weissman which reflected their interests in OPM and Cali. In addition, they met with OPM's investment bankers, Lehman Brothers Kuhn Loeb, Inc. and received a list of OPM's major customers and bank references for OPM.

Following approval of the proposed loan by the appropriate groups within LNB and Mercantile Bank, LNB issued in June 1978 its commitment letter for the loan. As part of its commitment, LNB required a $60,000 commitment fee, half of which was to be returned if the loan was closed. OPM paid the entire commitment fee by check directly to LNB.

While the closing occurred in Louisiana in late July 1978, some of the documents were signed prior to closing in New York and were delivered at closing. These documents were executed in New York to meet an FDIC requirement that there be proof that the closing was to occur. The contract provided that it was deemed to have been made under the laws of the State of Louisiana. It is undisputed that at the time the loan transaction was consummated, LNB knew that OPM's cash flow would service the proposed loan. Indeed, LNB required Goodman and Weissman to cause OPM to establish a checking account with LNB. Goodman and Weissman also caused OPM to make payments out of OPM funds to service the LNB loan. Payments on the principal and interest totalled approximately $4,500,000. Further payments by OPM included those to LNB's counsel, brokers fees and Singer Hutner's legal fees. Not one cent was paid directly by either Goodman or Weissman.

Following the closing, the $30,000 to be returned to OPM under the June 9, 1978 commitment agreement was instead returned to Goodman and Weissman. In the summer of 1979, LNB became concerned about the small balance maintained in OPM's checking account with LNB. In response, Goodman and Weissman proposed and LNB accepted a voluntary increase in the interest rate to be paid on the loan from 1¼% over the Chase Manhattan Bank, N.A. floating prime rate to 2½% over that rate. It was OPM that continued to meet the loan payments even under the increased interest rate.

According to the deposition of G. Griffin, LNB's President, it was in part because OPM and Cali could not legally pledge the FNJ stock that the loan was termed one to Goodman and Weissman. This legal infirmity was caused by the fact that OPM and Cali had not filed an application for a one-bank holding company with the Federal Reserve. See Griffin deposition, pp. 51–52, at p. 78 of the Affidavit of Henry L. Goodman, sworn to December 10, 1982 (the "Goodman Affidavit"). In addition, by letter dated January 29, 1979, Goodman and Weissman expressed their desire to transfer real ownership of the stock to Cali, OPM's parent, of which they were the sole owners. See Sutton Affidavit, Exhibit 15.

Prior to the filing of the Chapter 11 petition by OPM, Goodman and Weissman agreed to sell the aforesaid stock plus 13,460 additional shares which they had purchased in or about June 1980. Following the filing of the Chapter 7 petitions by Goodman and Weissman, the stock sale was renegotiated and was approved by this Court subject to all liens, encumbrances and claims thereto including those of LNB in this proceeding.

### III. Issues Presented

The issues presented by this summary judgment motion are: (1) whether the law of Louisiana must be applied regardless of the contours of any alleged fraud because the State of Louisiana, as a matter of law, has more significant contacts with the transaction at issue than those of the State of New York; (2) whether LNB had no actual or constructive knowledge of Goodman and Weissman's defective title to the FNJ stock as a matter of law; and (3) whether under either Louisiana or New York law the Trustee cannot recover under any circumstances based upon Goodman and Weissman's fraudulent conveyance.

### IV. Discussion of Law

LNB, in seeking judgment dismissing the amended complaint, argues that there exist no material disputes with reference to the relevant facts concerning the Trustee's claim against LNB and that, therefore, a summary judgment ruling by this court is in order. However, LNB has failed to demonstrate "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FRCP § 56(c); Bankruptcy Rule 756. The burden is on the movant to establish the lack of any genuine material triable issue of fact. If the movant does not sustain this burden, summary judgment must be denied even if the adver-

sary has not offered any opposition. *See Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 161, 90 S.Ct. 1598, 1610, 26 L.Ed.2d 142 (1970). In determining whether this task has been accomplished, the court must resolve all ambiguities and draw all reasonable inferences in favor of the party against whom summary judgment is sought. *See Bishop v. Wood,* 426 U.S. 341, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976); *U.S. v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962). *Accord, Heyman v. Commerce & Industry Insurance Co.,* 524 F.2d 1317 (2d Cir.1975). Still, the task is not one-sided for the "adverse party may not rest upon the allegations or denials of his pleading, but his response ... must set forth specific facts showing that there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate, shall be entered against him." FRCP Rule 56(e).

Thus, the issue before this Court is in essence whether there exists a genuine dispute between the parties over a material fact. While this rule has been applied many times, it is not possible to formulate a general rule for determining the existence or non-existence of disputes over material facts. "The determination in each case must depend upon the particular facts and circumstances of the case." *Ramsouer v. Midland Valley R. Co.,* 44 F.Supp. 523, 526–27 (W.D.Ark.1942).

■ It is the decision of this Court that there are material factual issues relating to LNB's actual or constructive knowledge of OPM's status as the insolvent real party in interest in these transactions which prevent the granting of summary judgment in favor of LNB. These factual issues affect not only the ultimate determination of whether or not the pledge of stock should be vitiated as a fraudulent conveyance or otherwise and all OPM payments in service of the loan should be returned, but also affect the threshold determination of which state's

law regarding fraudulent conveyance should govern. Accordingly, this Court will first discuss the choice of law issue as to which state's law, that of Louisiana or New York, should control followed by an exploration of law regarding the issue on the merits of whether, as a matter of law, no fraudulent conveyance took place.

### A. The Conflict of Law Issue

The pledge of stock to LNB is merely one aspect of a complex array of operative facts involving multistate business contacts. This adversary proceeding involves not only the validity of a pledge of stock in Louisiana, but also a New York nexus in the fields of constructive, resulting and passive trusts and alleged fraudulent conveyances by New York officers, directors and shareholders of OPM, an insolvent New York corporation[2]. In addition, fraudulent conveyances and preferences under the Code are in dispute. Accordingly, a choice of law determination is the threshold issue. However, prior to deciding which state's law governs, we must first determine which state's choice of law rules will be applied.

■ In the landmark case of *Erie R. Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), the Supreme Court held that in diversity of citizenship cases based on non-federal matters, the federal court should apply the law of the state in which it presides in order to create uniformity between state and federal decisions in those areas. However, one of the questions left unanswered by *Erie* was which state's law is to be applied in situations involving multistate contacts. In response, the Supreme Court has held that in actions on contracts made and to be performed in states other than the forum, the rights and liabilities of the parties shall be established following a determination as to whether the laws of the forum state or the other state shall apply. This determination shall be made according to the forum state's rule in the filed of

---

**2.** In criminal proceedings related to the OPM bankruptcy Goodman, Weissman and other OPM officers and directors have been indicted, convicted and sentenced for their participation in various schemes amounting to a $200 million fraud in the diversion of corporate funds to personal use and advantage and to the disadvantage of creditors.

conflict of laws. *See Klaxon Co. v. Stentor Electric Manufacturing Co.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); *Griffin v. McCoach,* 313 U.S. 498, 61 S.Ct. 1023, 85 L.Ed. 1481 (1941). *Accord, Day and Zimmerman & Challoner,* 423 U.S. 3, 96 S.Ct. 167, 46 L.Ed.2d 3 (1975). Therefore, in the application of the *Klaxon* rule, this Court relies on the conflict of law rules of the State of New York, the forum state [3].

In the leading case determining New York's rule on conflict of laws, *Auten v. Auten,* 308 N.Y. 155, 124 N.E.2d 99 (1954), New York's highest court adopted the "center of gravity" or the "grouping of contracts" theory with respect to choice of law in contract cases.

In *Auten,* the Court of Appeals discussed this theory, stating:

Under this theory, the courts, instead of regarding as conclusive the parties' intention or the place of making or performance, lay emphasis rather upon the law of the place 'which has the most significant contacts with the matter in dispute' [citations omitted] *Id.* 308 N.Y. at 160, 124 N.E.2d at 101–102.

\* \* \* \* \* \*

[T]he merit of its approach is that it gives to the place having the most interest in the problem paramount control over the legal issues arising out of a particular factual context, thus allowing the forum to apply the policy of the jurisdiction most intimately concerned with the outcome of [the] particular litigation.

*Id.* at 161, 124 N.E.2d at 102, (citations omitted).

Following its holding in *Auten,* the New York Court of Appeals abandoned the traditional choice of law rule of the place of the tort, declaring in *Babcock v. Jackson,* 12 N.Y.2d 473, 191 N.E.2d 279, 240 N.Y.S.2d 743 (1963):

The 'center of gravity' or 'grouping of contacts' doctrine adopted by this court in conflicts cases involving contracts impresses us as likewise affording the appropriate approach for accommodating the competing interests in tort cases with multi-state contacts. Justice, fairness and 'the best practical result' may best be achieved by giving controlling effect to the law of the jurisdiction which because of its relationship or contact with the occurrence or the parties, has the greatest concern with the specific issue raised in the litigation.

*Id.* at 481, 191 N.E.2d at 283, 240 N.Y.S.2d at 749.

Similarly, the New York Court of Appeals in *Intercontinental Planning, Ltd. v. Daystrom, Inc.,* 24 N.Y.2d 372, 300 N.Y.S.2d 817, 248 N.E.2d 576 (1969), applied the *Auten* center of gravity test to determine whether to apply the New York Statute of Frauds in a finder's fee case. In so doing, the court determined that New York was "most intimately concerned with the outcome of the particular litigation." *Daystrom,* 24 N.Y.2d at 382, 300 N.Y.S.2d at 823, 248 N.E.2d at 582 (quoting *Auten v. Auten,* 308 N.Y. 155, 161, 124 N.E.2d 99, 102). In applying the New York Statute of Frauds, the court reasoned that the policy behind the adoption of a statute of frauds in New York extends to protecting out of state principals in affording them a great degree of protection against unfounded claims by brokers and finders, thereby encouraging their use of New York brokers and finders and contributing to the economic development of New York. The court also reasoned that most of the significant business contacts took place in New York and that the absence of a statute of frauds concerning finder's fees in New Jersey indicated that no true conflict of law existed. *Id.* at

---

**3.** With reference to the view that because bankruptcy controversies arise "under the Laws of the United States", *National Mutual Ins. Co. of District of Columbia v. Tidewater Transfer Co.,* 337 U.S. 582, 652, n. 3 [69 S.Ct. 1173, 1198, n. 3, 93 L.Ed. 1556] (1949), the *Klaxon* rule is inapplicable to bankruptcy proceedings, this Court finds persuasive the concurrence in *Fore Improvement Corp. v. Selig,* 278 F.2d 143, 147 (2d Cir.1960) (Friendly, J. concurring), where Judge Friendly declared that so long as "no [national] policy of the Bankruptcy Act would be offended", the court is free to apply *Klaxon. See also In re D.H. Overmyer Co., Inc.,* 12 B.R. 777, 784 ( [Bkrtcy.] 1981).

384–85, 300 N.Y.S.2d at 824–825, 248 N.E.2d at 583–84.

█ In applying the "center of gravity" test, three analytical steps must be undertaken. *See Krauss v. Manhattan Life Insurance Company of New York,* 643 F.2d 98 (2d Cir.1981) and *Dym v. Gordon,* 16 N.Y.2d 120, 209 N.E.2d 792, 262 N.Y.S.2d 463 (1965), where the courts indicated that:

(1) The court must isolate the issue on which the laws conflict;

(2) The court must identify the purposes of the conflicting state laws to determine whether a genuine conflict exists;

(3) The court must examine the contacts of the interested jurisdictions to ascertain which has the closer connection with the facts of the case and thus has the superior interest in having its law applied. *See Krauss, supra,* at 100; *Dym,* 16 N.Y.2d at 124, 209 N.E.2d at 794, 262 N.Y.S.2d at 466.

█ As detailed more fully in Part B of this opinion, there exist significant disputes as to material facts between the parties. These disputes not only invalidate LNB's claim that the record is barren of facts indicating that it had any knowledge of a third party claim to the FNJ stock pledged as collateral, but also vitiate LNB's contention that as a matter of law, Louisiana law may be applied to resolve this knowledge issue. It is only after the significant dispute as to knowledge and whether a fraudulent conveyance took place is resolved that this Court may properly determine which state has the closer connection with the facts of the case and thus the "superior interest" in applying its own law.

LNB argues that numerous contacts with the State of Louisiana require Louisiana law to apply. It points to the following undisputed facts: (1) The loan was consummated in Louisiana; (2) The funds were disbursed in Louisiana; (3) Payments were received in Louisiana; (4) The parties elected by contract both in the July 1981 Loan Agreement executed by Goodman, Weissman, OPM and Cali, and the continuing guarantee executed by OPM and Cali to be governed by Louisiana law; (5) The stock was held in pledge in Louisiana; (6) The stock was of a bank domiciled in Louisiana. LNB seeks to have Louisiana law apply because it contends that under Louisiana law there is no concept of constructive trust or purchase money trust and that the revocatory action, Louisiana's equivalent of fraudulent conveyances, cannot be employed by the Trustee.

The Trustee, although disputing LNB's interpretation of Louisiana law, contends that either the law of New York should apply as a matter of law or that the resolution of this issue is a mixed question of law and fact.[4] In support of his position, the Trustee relates the following undisputed facts: (1) Both of the debtors, Cali and OPM, are New York corporations; (2) Goodman and Weissman, the sole stockholders of Cali and the dominant directors and officers of both Cali and OPM, are New York residents; (3) The business operations of both Cali and OPM as well as Goodman and Weissman were located in New York; (4) The loan agreement with LNB was executed by Goodman, Weissman, Cali and OPM in New York; (5) The agreements between Goodman and Weissman with Cali guaranteeing the debt owed LNB were made in New York between New York corporations and residents; (6) New York is the situs of the ownership of the pledged stock as between Goodman and Weissman or Cali and OPM; and (7) There are a substantial number of New York creditors who have claims in the Chapter 11 cases of OPM and Cali.

The Trustee further argues that modern day banking has little to do with the state where the bank is located because banks now solicit borrowers by blanketing the national and international financial markets. Thus, he argues that Louisiana's interest in

---

4. The Trustee also indicates that the initial question of which state's choice of law provision should be used to determine which state's law should apply is one of mixed law and facts.

This Court cannot accept this argument for the reasons detailed in the discussion of *Klaxon, supra* at p. 748 and note 3.

these transactions is minimal and transitory.

The Trustee also rebuts LNB's substantial reliance on the provisions in the loan agreement specifying that Louisiana law should govern, citing cases from various jurisdictions where courts have declined to give effect to such provisions. *See, e.g., In re Herold Radio & Electronics Corp.*, 327 F.2d 564 (2d Cir.1964) (where the Second Circuit upheld a finding that New York law governs the rights of creditors with respect to equipment leased to the debtor regardless of the lease provision calling for construction in accordance with California law); *Davis v. Humble Oil & Refining Co.*, 283 So.2d 783 (La.App.1973) (where the Court of Appeal of Louisiana rejected as a contract of adhesion the contract provision that the law of New York rather than Louisiana would control because "the law chosen must have a significant relationship to the contract". *Id.* at 788 [5]); *In re Clark*, 21 N.Y.2d 478, 236 N.E.2d 152, 288 N.Y.S.2d 993 (1968) (where the Court refused to give effect to a will provision that the law of a foreign state would apply because to do so would be in direct violation of the decedent's intent).

The Trustee thus contends that New York has a closer connection with the facts of this case and a superior interest in policing the activities of insolvent New York corporations and in remedying wrongs to creditors of New York corporations principally perpetrated by New York residents. There indeed is validly a close connection between New York and the facts of this case. *See In re Lea Fabrics*, 226 F.Supp. 232 (D.N.J.1964), where the court declared that "as argued by the Trustee, Lea Fabrics' creditors, in doing business with Lea, would undoubtedly and reasonably assume that they would be subject to and protected by the laws of the State of New Jersey and no other state." *Id.* at 236.

However, it is apparent that a mere accounting by numerosity of the contacts asserted and undisputed by both sides yields no clearcut winner since both Goodman and Weissman and LNB have articulated equivalently strong nexi between the transactions at issue and their respective states. Accordingly, this Court must determine the essential question of which state has a greater interest in having its law decide the issue on the merits by filling in the contours of the alleged fraudulent conveyance with concrete, disputed facts to be determined at trial. This court is thus persuaded by the Trustee's argument that the application of the "center of gravity" test here involves a determination of disputed questions of material facts and cannot be accomplished as a matter of law. It is abundantly clear that material issues exist herein as to, *inter alia:* (1) whether LNB entered into the loan agreement with knowledge of the insolvency of OPM and Cali; (2) whether LNB knew that the real contracting parties were Goodman and Weissman; (3) whether and when LNB had reason to know based upon all of the data available at the time that Goodman and Weissman were the real contracting parties; (4) whether, and if so, when LNB had reason to know that Goodman and Weissman were insolvent, *i.e.* Did LNB have reason to know when it first negotiated with Goodman and Weissman or when it executed the loan agreement or when it received the loan payments, or ever?; (5) the effect of LNB's complicity in facilitating the purchase of FNJ stock on Goodman and Weissman's fraud upon OPM's creditors both in New York and elsewhere; (6) the scope and extent of the fraud attributable to LNB's participation, if knowing participation; (7) the significance of the meetings held both in New York and Louisiana to the conveyances, if fraudulent; (8) to what extent, if any, LNB is responsible, based upon its participation in the loan transaction and pledge of stock, for the

---

**5.** It thus appears that Louisiana too has adopted the "significant contacts" conflict of law doctrine. *See Davis, supra* at 788–790. It should also be noted, however, that on rehearing, the Louisiana appellate court con- fessed that it had skirted the conflicts issue by concluding that the law of both states was the same, and then held "nor do we know of any compelling reason why New York law should not apply to this case." *Id.* at 794.

resultant creditor losses and to which creditors or class of creditors specifically is LNB responsible—*i.e.*, Are they New York based corporations?; and (9) whether any of the payments by OPM to LNB were made with the actual intent to delay or defraud creditors. If so, was LNB aware of this fraudulent intent?

All of these issues are material in that they affect the ultimate question for determination on the merits—LNB's degree of scienter and its impact on whether a fraudulent conveyance took place or not. They are also material in that their resolution impacts directly upon the determination of which state has the greatest interest in making the decision on the above-described ultimate question. It is only once a determination that a fraud has been committed accompanied by findings as to who was responsible, how it was committed, how much was involved, who was involved as perpetrator, victim, etc. where they are domiciled, and where the fraud's essential components took place that this Court may ably ascertain which state has the greater interest in seeing to it that its laws govern. For example, if it is ascertained at trial that there was a fraudulent conveyance in that LNB entered into the deal knowing that OPM was insolvent and acting in derogation of the interests of its existing creditors, then perhaps the laws of New York should apply so as to protect those existing creditors. New York may have a predominant interest in applying its laws to protect creditors of a New York corporation and in preserving that corporation's assets as a trust fund for its creditors. Also, the creditors disadvantaged may be New York based.

Moreover, if it is determined that a fraud was committed, the state where most of the important meetings took place facilitating that fraud could have the superior interest in redressing fraud within its boundaries. The determination of which meetings were

"significant", however, must await the determination of the contents of the fraudulent transaction.

■ In addition, this Court believes that there are important factual issues to be determined in any application of the choice of law rule espoused by the Trustee in Point III of its Memorandum in Opposition to Summary Judgment. Although this choice of law rule is based on case law decided before *Erie* and *Klaxon*, that is, *Irving Trust Co. v. Maryland Casualty Co.*, 83 F.2d 168 (2d Cir.1936), *cert. denied*, 299 U.S. 571, 57 S.Ct. 34, 81 L.Ed. 421 (1936), (per L. Hand, J.) and the cases cited therein, this Court finds some merit to this choice of law theory founded on where the tort took place. It is a useful adjunct theory because the question of the place of inception of the tort is an integral part of the "center of gravity" test currently in vogue. In *Irving Trust*, the Second Circuit held that regardless of the law of the situs of real estate transactions, each transaction can be characterized as a tort so that the law of the place of the wrong, New York, where the fraudulent delivery took place, controls. The Second Circuit held that regardless of the law of the wrong, New York, where the fraudulent delivery took place, controls. *Id.* at 171. Like the court in *Irving Trust*, this Court has *in personam* equity jurisdiction over the alleged tortfeasors, 28 U.S.C. § 1471 (Supp. V 1981).[6]

Applying this theory, a critical fact yet to be determined is whether there was a fraudulent conveyance and how, when, why, where and how much was involved so as to ascertain where its inception took place. Because it might appear that the *principal* business activities relevant to the loan took place in either Louisiana or New York, it is not until this Court determines the issue of if and when LNB had reason to know of OPM and Cali's insolvency that it can properly determine in which state the

**6.** The authority of this Court to determine this traditional bankruptcy controversy in the context of this proceeding to set aside fraudulent conveyances and for preferences is set forth in Rule d(3)(A) of Emergency Bankruptcy Rule I adopted by the U.S. District Court for the Southern District of New York, which rule is the local counterpart of a suggested rule of the Judicial Conference.

significant meetings took place launching the tort.

In sum, it is only if and when the contours of a fraud are established that this Court may exercise its equitable powers on the authority of the predominant "center of gravity" test and *Irving Trust* to circumvent Louisiana law and effectively redress the fraudulent conveyance under New York and federal law.

### B. The Dispute As to LNB's Actual or Constructive Knowledge

#### 1. The Validity of the Pledge and the Avoidability of the Loan Payments Under Louisiana Law

LNB contends that the issue of LNB's knowledge or good faith, which is the crux of the question as to the validity of the pledge and the loan service payments, has been eliminated under the prevailing law, that of Louisiana. It argues that under Louisiana law, there is no recognition of constructive or resulting trusts. LNB further contends that no matter what the relationship among OPM, Cali, Goodman and Weissman, and regardless of what remedies OPM and Cali might have against their former officers, the LNB pledge lien is effective against them and their creditors as a matter of law. For Louisiana cases cited by LNB for this proposition, see e.g. *Ribet v. Bataille,* 35 La.Ann. 1171 (1883); *J. Davidson & Hill v. Bodley,* 27 La.Ann. 149 (1875); *Giovanovich v. Citizen's Bank of Louisiana,* 26 La.Ann. 15 (1874). In point of fact, however, these authorities antedate by 100 years the instant controversy and are inapposite in that they involve a court finding of good faith after trial.

For example, in *Giovanovich v. Citizen's Bank of Louisiana, supra,* plaintiff's agent placed certain notes with a broker with instructions to sell. Instead, the broker pledged the notes to secure an overdraft in his bank account. The broker disappeared and the bank sought to have the notes sold and their proceeds applied to the overdraft. The court found that the pledge secured a valid debt, that the broker had lawful possession of the notes, and that plaintiff failed to prove that the pledgee bank came into possession in an illegal and unlawful manner and, thus, was not a bona fide holder. In effect, the alleged true owner of the property impliedly consented to the agent's pledging the property to a *bona fide* pledgee when he gave the agent the power to sell.

Similarly, in *J. Davidson & Hill v. Thomas B. Bodley,* 27 La.Ann. 149 (1875), Norwalk Iron Works, intervenors, placed certain machinery with defendant, their selling agent, which defendant pledged to secure his own indebtedness to plaintiffs. The court stated "the same principle which sustains the pledge of a note as collateral, which is placed in the hands of a broker to sell, must apply here." Accordingly, the pledge was enforced since the pledgees were not proven to have known that the machinery belonged to the intervenors.

LNB argues that *Ribet v. Bataille,* 35 La.Ann. 1171 (1883), is similar to the case at bar as it involved a claim of underlying ownership of stocks and bonds. The court in *Ribet* found that the stocks and bonds belonged to Jacques Bataille who, for an unknown reason, had placed the property in the name of his brother Leon and had taken back a power of attorney to manage it. After Leon became insolvent, his agent sued Jacques to recover the stocks and bonds or their value. However, Jacques had pledged the property to Foch, a pledgee for value who had relied upon Jacques' apparent ownership. The court reasoned:

> If third parties had dealt with these two on the faith of the apparent ownership created by their joint acts and representations, they could not be prejudiced by the revelation of the true ownership now for the first time disclosed. But the only third party interested is Foch, and his claim is based on the fact of ownership by the defendant Jacques Bataille.... *There is no question of Foch's good faith,* none of the reality of the pledge. He was ignorant of the complications produced by the acts and declarations of the brothers, and is not affected by them. *Id.* at 1174 (emphasis added)

Thus, the court denied the claim of Leon's agent, and found that Foch was a bona fide pledgee.

*Honold v. Meyer,* 36 La.Ann. 585 (1884), also cited by LNB, is similarly distinguishable since the court also found that the pledgee had no knowledge of the plaintiff's alleged ownership of the stock in question and thus was a good faith pledgee.

In *State ex rel. Louisiana State Bank v. Bank of Baton Rouge,* 125 La.Ann. 138, 140, 51 So. 95 (1910), the pledgor had pledged stock certificates issued in his name to the Louisiana State Bank to secure a note. It was subsequently determined that the pledgor's title had been defective. When the pledgee sued to compel the issuer of the stock to cancel the certificates and issue new ones, the court granted a writ of mandamus in favor of the pledgee. The court specifically found that the pledgee had "acquired the certificates sued on in good faith for value without notice, and in the usual course of business." *Id.* at 144, 51 So. at 97. Accordingly, the statement of the Court relied upon by LNB, that a pledgee of stock is required to look no further than the registry of the last transfer, may not comprehend and consider the entirely different circumstances of the case at bar. Here, the pledgee may have had notice or knowledge amounting to bad faith that the purported nominal registered owners were not the true owners of the shares, that an extensive looting of corporate funds for the benefit of its principals was occurring, and that the intended or actual beneficial owner was not the purported borrowers.

In all these cases cited by LNB, the good faith issue was resolved by the trier of fact in favor of the pledgee. Here, too, the factual issues raised by LNB's participation in the suspect transaction can only be determined at trial.

■ Even assuming, as LNB does, that Louisiana law applies, LNB's arguments are replete with legal conclusions based upon factual issues yet to be resolved. The status of LNB as a bona fide pledgee of the FNJ stock or its proceeds is questionable and at best is a genuine fact question to be determined at trial. In Louisiana, a party claiming true ownership of pledged property can defeat the rights of a pledgee for value by proving that the pledgee, at the time the pledge, had actual or constructive knowledge of its pledgor's defective title to the pledged collateral amounting to bad faith. *See Saloy v. Hibernia National Bank,* 39 La.Ann. 90, 1 So. 657, 659 (1887). The test of good faith in *Saloy* was articulated as follows:

> On this statement of facts the sole question presented for consideration is whether the certificates were pledged to the bank 'in the ordinary course of business' or 'under circumstances as should have put the bank on inquiry'.

1 So. at 658.

In *Acadiana Bank v. Foreman,* 343 So.2d 1138, 1141–42 (La.App.1977), this test was reiterated by a Louisiana court, stating that "[by] 'good faith' [it] is meant that the pledgee did not know, and should not have known, of a defective title in the pledgor." *Accord, Leadman v. First National Bank of Shreveport,* 184 La. 567, 167 So. 83 (1936); *Calhoun v. David Burk Co.,* 153 So. 568 (1934); *Maxwell v. W.B. Thompson & Co.,* 175 La. 252, 143 So. 230 (1932).

In *Maxwell v. W.B. Thompson & Co., supra,* after the plaintiff shipped cotton bales to a partnership acting as a factor and commission merchant, one of the partners pledged warehouse receipts for most of the cotton to two banks to secure a partnership indebtedness. When the banks refused to allow delivery of the cotton, the plaintiff brought suit against the banks, the pledgees of the warehouse receipts, and other to recover the cotton or its value. The banks claimed that plaintiff had expressly authorized the factor to store the cotton in public warehouses and to receive warehouse receipts *in its own name,* thus permitting the factor to treat the cotton as its own, and that they were holders in due course.

Because the plaintiff had submitted financial statements to the banks during each of the preceding eight years, the court held that the pledgee banks had notice, if not

actual knowledge, that the partnership's business was exclusively that of factor and commission merchant, the partnership handled no cotton on its own account, the pledged cotton belonged to customers, and the pledges were a breach of the factors' duty and trust to plaintiff and its other customers. In arriving at its conclusion, the court reasoned:

> Notice, in its accepted legal sense, means such information on the part of the person charged with notice as would put a prudent person on inquiry to ascertain the true or actual facts. 43 So. at 233.

Consequently, the cotton and warehouse receipts were returned to plaintiff and the banks forfeited their pledge lien.

In *Leadman v. First National Bank of Shreveport, supra,* the defendant bank was the depository of two separate accounts: one, in the individual name of the plaintiff's mother; the other, in her name as the plaintiff's tutrix. The plaintiff sued the bank to recover ten bonds that his mother had pledged to the bank to secure her personal indebtedness. The bonds had been purchased for the plaintiff in exchange for certain participating certificates of the bank, which had previously been bought in the plaintiff's name with funds from the tutorship account. The court determined that the bank had access to sufficient information to put it on notice that the pledged securities had been purchased with funds originating from the tutorship account, that the records of the bank, although not necessarily indicating ownership, put the bank upon inquiry, since it was "dealing with a person in a fiduciary account, and the debt [was] that of the fiduciary." 167 So. at 86. The bank was ordered to return the pledged

property or, in default of such delivery, to pay plaintiff its full value.

Because the defendant in *Calhoun v. David Burk Co., Inc.,* 153 So. 568 (La.1934), could not lawfully issue commercial paper or mortgage its property to pay another's indebtedness, its president, who owned all but two shares of the corporate stock, pledged notes and mortgages signed by him as president as security for his personal indebtedness to the plaintiff. When the pledgee sued to foreclose on the mortgage, the court found that he had acquired the notes in bad faith, with knowledge of his pledgor's defective title. In directing delivery of the notes to the defendant free of the pledge lien, the court stated:

> The outstanding facts were of such nature, and so patent, as to put anyone on guard concerning Burk's title to the notes and his right to negotiate them for his personal account. It is well settled that when a person deals with another in a fiduciary capacity, he is required to investigate the powers of such person in order to play safe, otherwise he acts at his own risk and peril. When these notes were tendered by Burk to plaintiff as security for his account, there was sufficient information disclosed on their face to put him on guard, and if the mortgage and resolution of defendant's board of directors, attached thereto, had also been examined, as they doubtless were, these would have brought home to him the fact that Burk had no right to negotiate the notes for his own convenience and account.

*Calhoun,* 153 So. at 569.[7]

 LNB argues that the pledge of the FNJ stock is valid since Goodman's and

---

7. Two recent Louisiana cases further highlight that a pledgee with knowledge or reason to know of defective title cannot enjoy the benefit of this pledge. They involve unauthorized repledges of collateral mortgage notes to secure additional loans made after the original obligations, validly secured by such notes, were repaid. In *First Guaranty Bank v. Alford,* 366 So.2d 1299 (La.1978), Mrs. Alford pledged a collateral mortgage note as security for a debt of her husband in favor of First Guaranty Bank. After the loan had been repaid, Mr. Alford took

a second loan and used the same note as collateral security without his wife's knowledge or consent. Upon default, the bank sued on the note. The court found that even though the collateral mortgage note was in bearer form, it was "not a debt instrument but a security device" and that Mr. Alford was never a holder. *Id.* at 1303. The court also found that the pledgee bank had full knowledge of the true ownership of the note and was fully cognizant of the conditions and limitations under which it possessed the mortgage note. Consequently,

Weissman's ownership and consequent authority to pledge such stock is shown on the face of the certificates. Nevertheless, *Calhoun* and Louisiana law in general are not distinguishable on that basis. As demonstrated by *Maxwell v. W.B. Thompson & Co., supra*, in which warehouse receipts *in the name of the pledgor* were pledged to the bank, Louisiana courts will look beyond the face of a pledged instrument to determine whether the pledgee had notice sufficient to raise a duty of inquiry concerning the true ownership of the pledged property. Moreover, LNB may not have reasonably relied on the ostensible ownership by Goodman and Weissman of the FNJ stock, since their acquisition of the stock took place simultaneously with the closing of the loan, under a contract of purchase in which they were described as "*doing business* as O.P.M. Leasing Services, Inc.," and against a background of LNB's knowledge that OPM had made and would make the loan payments.

In its Reply Brief, LNB also seeks to distinguish *Maxwell, Calhoun* and *Leadman* because these cases involved no consent by the true owner of the pledged items to the pledge. However, this is not a valid distinction for two reasons. First, there is a factual issue in the instant case as to whether OPM and Cali did validly consent to the loan transaction because it may have been undertaken by Goodman and Weissman in breach of their fiduciary duties to these corporations. Second, the issue of consent is irrelevant to the crux of the inquiry here as to whether LNB had actual or constructive knowledge that OPM and Cali were insolvent and that they were to be the true owners of the FNJ stock.

In addition, the Trustee cites various other facts in addition to the "doing business

as" language in the agreement described above which should have put LNB on notice of Goodman and Weissman's defective title. For example, he asserts that: (1) OPM made every single payment on the loan until it filed under Chapter 11. *See* Amended Complaint, ¶ 32; Transcript of Oral Argument held on December 23, 1982 at 13; (2) One of the reasons the loan was made in the names of Goodman and Weissman was that neither OPM nor Cali could legally pledge the stock of FNJ to LNB. *See* Deposition of G. Griffin, President of LNB, as described in the Goodman Affidavit at 78; (3) LNB knew and relied upon the fact that OPM was to be the primary source of loan repayment. *See* Deposition of John Munsell, Senior Vice-President of LNB, Goodman Affidavit at 17, 34.

Similarly, LNB cites various facts in an effort to demonstrate that LNB had no reason to be on notice of the stock's defective title. For example, it asserts that: (1) The loan agreement refers to Goodman and Weissman as the parties intending to purchase the FNJ stock from the FDIC. *See* Amended Complaint, Exhibit 2; (2) A letter dated July 26, 1978 from Singer Hutner to LNB refers to Goodman and Weissman as the parties seeking to purchase the FNJ stock. *See* Sutton Affidavit, Exhibit 7; (3) A letter by Goodman and Weissman dated July 26, 1978 to the FDIC refers to Goodman and Weissman as the purchasers of the FNJ stock. *See* Sutton Affidavit, Exhibit 9; (4) A letter signed by Goodman and Weissman to the FDIC specifies that the "price paid for the Shares of stock has been obtained solely with the separate funds of the Purchasers and not with community property funds. Additionally, the undersigned Purchasers declare their intention to

---

the court held that Mrs. Alford, as the maker and true owner of the collateral mortgage note, had no liability on the note.

In the second case, *Mara v. McCoy*, 369 So.2d 246 (La.App.1979), four principals of a corporation pledged collateral mortgage notes as security for a loan to the corporation. When the loan was paid, two of the principals, the vice president of the corporation and defendant, did not cancel the mortgage notes. The vice president and the private lender sub-

sequently negotiated another loan to the corporation. The promissory note executed for the second loan stated that the loan was secured by defendant's and the vice president's collateral mortgage notes. Most significantly, the court held that the lender, through its own negotiations and the employment of counsel to handle the relevant loan transactions, was chargeable with knowledge of the defective second pledge.

acquire the Stock solely for the benefit of their separate estates". *See* Sutton Affidavit, Exhibit 11.

The mere fact that LNB and the Trustee both seek to convince the Court of their versions of disputed facts on the knowledge issue indicates clearly that this crucial issue cannot be determined as a matter of law without the assistance of live witnesses whose credibility can be assessed by the trier of fact. Accordingly, LNB is precluded from asserting that it is a bona fide pledgee as a matter of law. Summary judgment is thus unwarranted and must be denied.

My decision denying summary judgment on this basis is made with full recognition of the further argument raised by LNB as to the inapplicability under all of the factual circumstances of a revocatory action under Louisiana law on the part of the Trustee due to its one-year statute of limitations.

The revocatory action is the analog in Louisiana to the federal and New York law of fraudulent conveyances and is contained in Louisiana Civil Code Arts. 1969 through 1994. A creditor can thereby bring an action to avoid a contract which defrauds creditors by transferring ownership of the debtor's property or by giving a third party a right in the debtor's property. Under Civil Code Art. 1989, the revocatory action encompasses all contracts which deprive creditors of recourse against the debtor's property. Civil Code Art. 1969 provides that "every act done by a debtor with the intent of depriving his creditor of the eventual right he has upon the property of such debtor, is illegal, and ought, as respects

such creditor, to be avoided." *See also Price v. Florsheim*, 174 La. 945, 142 So. 135, 136 (1932). The Trustee's claims fit within this definition of a revocatory action because they are grounded on the premise that the loan between Goodman and Weissman defrauded OPM's creditors.

LNB argues, however, that the Trustee's action is barred by the one-year statute of limitations contained in Civil Code Art. 1987. LNB's conclusion is incorrect as a matter of law because it fails to consider Civil Code Art. 1994, which provides a one-year statute of limitations for certain revocatory actions which begins to run on the date a bankruptcy trustee is appointed.[8]

In *Gast v. Gast*, 206 La. 285, 19 So.2d 138 (1944), the court detailed the differences between the prescription periods provided in Civil Code Art. 1987 and Art. 1994. A creditor had sued her brother on a note. During the pendency of that action, the brother executed a mortgage in favor of his brother-in-law covering the only real estate he owned. Consequently, plaintiff brought a revocatory action to set aside the encumbrance.

The court in *Gast* held that Art. 1987, providing a one-year prescription period starting on the date of the injurious transaction, contains restrictive language and thus merely governs contracts made to secure just debts[9] and which contain no other cause of nullity than a debtor's preference of one creditor over another at a time when the debtor is insolvent and the preferred creditor has knowledge of such insolvency. The court held that:

> [Art. 1987] does not pertain to those contracts that are permeated with active,

---

**8.** Civil Code Art. 1994 provides in pertinent part:

> The action given by this section is limited to one year; if it is brought by a creditor individually, to be counted from the time he had obtained judgment against the debtor; *if brought by syndics or other representatives of the creditors collectively, to be counted from the day of their appointment.* (emphasis supplied)

**9.** The court in *Gast* explained that the specific situation involving just debts to which Art.

1987 applied is defined in Art. 1983 as where payment of a debt, justly due and owing, is secured with property approximately equal in value to the indebtedness and where there exists constructive fraud only because of the obligor's insolvency of which the obligee had knowledge. 19 So.2d at 141. The Trustee argues herein that there were not just debts in that OPM received no fair consideration in return for guaranteeing the loan to Goodman and Weissman.

deliberate or malicious fraud, confected by the parties with the intention of defrauding creditors. *Gast,* 19 So.2d at 141.

It should be noted that the court in *Gast* construed only the first part of Section 1994, as set forth in note 8, *supra,* which provides that a revocatory action may be instituted *if brought by a creditor individually* within one year of the date that creditor has obtained judgment against the debtor. It did not deal directly with the second part of that provision applicable here that allows syndics or other representatives of the creditors to sue within one year of their appointment. However, there appears to be no reason why the interpretation of the Louisiana court in *Gast* should not apply equally in the instant case.

Similarly, the court in *St. Germain and Marist v. Landry,* 28 La. 652, 652–53 (1876), held:

Art. 1987 of the Civil Code applies exclusively when the alleged nullity is an undue preference given to one creditor over another, and the action must then be brought within a year from the contract or judgment, while Art. 1994, applies to all contracts or judgments by which creditors are injured, and then the action is prescribed in one year, to date, if brought by a creditor individually, from his judgment against the debtor, and if by the syndic or representative of creditors, from his apointment. In this case article 1994 governs.

Consequently, LNB's reliance on the statute of limitations provided in Art. 1987 to bar as a matter of law the relief requested by the Trustee is misplaced because the fraud allegedly committed by LNB did not merely consist of endeavoring to obtain a preference over other creditors of Goodman and Weissman, but may well have involved participation in a fraud by financing the purchase of the FNJ stock with the names of Goodman and Weissman, with actual knowledge of the use of their corporation's funds to pay the loan. Therefore, LNB's conduct may come within the category provided in Art. 1989 of "all others [contracts] which are made in fraud of cred-

itors, and deprive them of their recourse against the property of their debtor."

Thus, the one-year statute of limitations of Civil Code Art. 1994 may have commenced on March 27, 1981, the date of the appointment of the Trustee. The instant adversary proceeding was initiated in November, 1981, and could have been timely brought within the one-year statute of limitations period. Accordingly, the Louisiana statute of limitations does not bar the Trustee's claim as a matter of law.

LNB also argues that under Civil Code Art. 1973 the defendant in a revocatory action may demand a "discussion" of the property belonging to the original debtor before any judgment can be rendered and that a revocatory action is not available in this proceeding because the proceeds from the sale of the FNJ stock produced sufficient equity to satisfy the Trustee's claims. Under this concept, a secondary obligor has the right to compel the creditor to enforce the obligation against the property of the primary obligor before enforcing it against the property of the secondary obligor. LNB appears to have misconstrued the concept of "discussion". In order to meet the discussion defense provided in Art. 1973, LNB would have to point to property of the debtor sufficient to pay *all* of the eligible creditors of Cali and OPM, not just itself, a single creditor. As the court in *Gast, supra,* explained:

[T]his remedy, known as the revocatory action, cannot be resorted to unless the debtor has not property sufficient to pay the debt of the complaining creditor, or the *debts of all his creditors where there has been a cession or any proceeding analogous thereto* . . . . [bankruptcy related proceeding]

*Gast,* 19 So.2d at 140 (emphasis supplied).

Moreover, contrary to LNB's assertions, Louisiana courts have used the doctrine of constructive trust in applying the revocatory actions to situations in which the plaintiff is the owner of the property in question instead of a creditor. Using either the doctrine of constructive trust or that of revocatory action in such a context pro-

duces the same result because in either instance, the contract under attack is rescinded.

For example, in *Sentell v. Richardson,* 211 La. 288, 29 So.2d 852 (1947), plaintiff Sentell entered into an agreement with defendant Richardson whereby defendant would use funds advanced by plaintiff to purchase corporate stock from a seller who refused to sell to plaintiff. After the stock purchase, defendant was supposed to have had the stock certificate reissued in his name, endorsed in blank, and delivered to plaintiff. It was agreed that the stock would remain in the defendant's name as long as mutually agreeable to both parties. Instead, the defendant purchased the stock for himself and his father and brother. The plaintiff immediately obtained an injunction prohibiting the secretary of the corporation from issuing new stock certificates to the defendant. Consequently, the defendant sold the stock in question to a third party, Martin, who was subsequently added as a party defendant to this action.

The court in *Sentell, supra,* found that Richardson could not acquire valid title to the stock in his individual name nor in his name as agent for his father and brother, since he was acting as agent for plaintiff, and also held that Martin had not purchased the stock in good faith for he had knowledge of the contract and transactions between plaintiff and Richardson. In ordering the stock returned to plaintiff, the court concluded:

> [W]hen the stock in question was transferred to him [Richardson] he acquired no real ownership therein but held the certificate merely as trustee for the account of his principal, who became the rightful owner thereof. *Sentell,* 29 So.2d at 857.

Similarly, in *Haynesville Oil Company v. Beach Drilling Company,* 159 La. 615, 105 So. 790 (1925), the defendant purchased a drilling rig in his own name contrary to his agreement with plaintiff, who had advanced half the purchase price. Subsequently, the defendant sold the rig to a corporation he had formed. Relying on *McClendon v. Bradford,* 42 La.Ann. 160, 7 So. 78 (1890), the court held:

> This was a breach of trust, and the title which defendant obtained to said rig inured to the benefit of plaintiff, whom he represented.

*Haynesville,* 159 La. at 618, 105 So. at 791. The court also found that the corporation was not a good faith purchaser. Consequently, the court held that plaintiff was the owner of the rig.

LNB cites *Mansfield Lumber Company v. Johnson,* 268 F.2d 317 (5th Cir.1959), for the proposition that Louisiana civil law prohibits the imposition of a constructive trust or any equitable lien on property. However, the *per curiam* decision in *Mansfield* found that breach of a fiduciary relationship is equivalent to fraud in Louisiana and that the appropriate remedy is either rescission of the contract or damages. Thus, the Louisiana courts have reached conclusions parallel with the common law. Accordingly, where fraud is involved, the name of the relief is not as important as the fact that the remedy, in either civil law or common law jurisdictions, can be rescission or damages, particularly with respect to contracts involving movable property. *See* dissent of Judge Wisdom in *McKenna v. Wallis,* 344 F.2d 432, 443 n. 5 (5th Cir.1964).

Moreover, in declining to call the appropriate remedy to redress fraud a "constructive trust", the Fifth Circuit in *Mansfield* incorrectly states that the law in Louisiana prohibits the imposition of a constructive trust. *Mansfield,* 268 F.2d at 319. In fact, the case they cite for that proposition, *Succession of Onorato,* 219 La. 1, 51 So.2d 804 (1951), holds that whether or not a constructive trust will be imposed in Louisiana depends upon the facts of the case. *Onorato,* 51 So.2d at 809. In any event, the holding of *Mansfield* is clear, that when a breach of fiduciary duty is found under Louisiana law, recission or damages is the appropriate remedy. Moreover, in Louisiana cases decided since *Mansfield,* courts have articulated that a cause of action for constructive trust is sustainable under proper circumstances. *See, e.g., Decatur-St. Louis Combined Equity Properties, Inc. Venture v.*

*Abercrombie,* 411 So.2d 677, 680 (La.App. 1982).

In sum, if LNB is found to have participated in defrauding the creditors of OPM and Cali and is thus precluded from asserting the status of bona fide pledgee, and, if Louisiana law applies, the Trustee can seek rescission of the loan agreement between LNB and Goodman and Weissman by use of the revocatory action set forth in the Civil Code or its variant, the constructive trust doctrine described in the foregoing cases.

2. *The Pledge and Loan Payments Under the Law of New York and the Code*

Under New York law and the Code the results should be substantially similar to those under Louisiana law. This is because New York law contains analogous provisions regarding fraudulent conveyances and trusts under which, if the Trustee proves knowledge or notice, the Trustee will be entitled to the relief he seeks.

In New York, a transfer of corporate funds is fraudulent if made when the corporation is insolvent or would thereby be rendered insolvent if the conveyance is made or the obligation is incurred without fair consideration. *See* New York Debtor and Creditor Law §§ 273, 274 and 275. Also, corporate directors, officers, and stockholders are accountable to creditors for the misappropriation of corporate funds, even in the context of loans. *See* N.Y. Business Corporation Law Sections 103(a)(c), 510, 714, 719(a)(4) and 720. Thus, directors and officers may not pursue personal endeavors inconsistent with their duty of undivided loyalty to their corporations. *See Foley v. D'Agostino,* 21 A.D.2d 60, 248 N.Y.S.2d 121 (1st Dep't 1964). These officers and directors are fiduciaries to the corporation's stockholders and creditors, *see, e.g., Kreitner v. Burgweger,* 174 App. Div. 48, 160 N.Y.S. 256 (4th Dep't 1916), and the right to recover for a breach of these duties passes to the trustee in bankruptcy. *See In re Happy Time Fashions, Inc.,* 7 B.R. 665 (Bkrtcy.S.D.N.Y.1980).

In the instant case, Goodman and Weissman, with LNB's assistance, whether knowing or unknowing, breached the fiduciary duties they owed to OPM and Cali and their creditors by participating in transactions which resulted in the waste of corporate funds and an exacerbation of the corporations' insolvency to the disadvantage of all creditors. Thus, if it is shown that LNB had knowledge or notice of the tainted title of Goodman and Weissman to the FNJ stock, this transaction may be avoided by the trustee under New York law. *See, e.g., Ballantine v. Ferretti,* 28 N.Y.S.2d 668 (Sup. Ct.N.Y.County 1941), (court decreed that trustee recover from third parties who had received diverted funds since such parties knew of the illegal transactions, had participated in them, and could not be deemed bona fide purchasers for value); *Ward v. City Trust Co.,* 192 N.Y. 61, 75, 84 N.E. 585, 588–89 (1908) (bank liable to corporation's creditors where it had not made sufficient inquiry where such inquiry would have revealed that president did not have authority he exercised).

It should be noted that the Code gives a trustee two remedies to redress fraudulent conveyances, both of which may apply here. Section 548(a) of the Code permits avoidance of a fraudulent transfer made within one year of the filing. Section 544(b), incorporates Article 10 of the New York Debtor and Creditor Law for purposes of this proceeding and gives a trustee the right within six years of a filing to avoid transfers made in breach of a fiduciary duty.

It should be noted that the provisions of Section 548(a) may apply because there is an issue as to fair consideration in the instant case. LNB argues that, as a matter of law, OPM and Cali received fair consideration for their payments to LNB in that the size of their debt to LNB diminished accordingly. However, citing *Rubin v. Manufacturers Hanover Trust Co.,* 661 F.2d 979 (2d Cir.1981), the Trustee correctly argued at oral argument on this motion that there has been no fair consideration because

in this three party transaction, the beneficiary of whatever consideration existed was not OPM. In *Rubin,* the Second Circuit held that transfers made to benefit third parties are not made for fair consideration and that a conveyance by a corporation for the benefit of an affiliate should not be regarded as given for fair consideration as to the creditors of the transferring corporations. The Second Circuit reasoned: "[I]f the debt secured by the transaction is not the debtor's own, then his giving of security will deplete his estate without bringing in a corresponding value from which his creditors can benefit, and his creditors will suffer just as they would if the debtor had simply made a gift of his property or obligation." *Id.* at 991. Thus, LNB's contention that there was fair consideration as a matter of law is unsupported in law and fact.

██ It is also well-established that under New York trust principles, the Trustee may be entitled to recover the FNJ stock. He is clearly not barred as a matter of law from its recovery under New York trusts law. EPTL Section 7–1.2 provides:

§ 7–1.2 *Trustee of passive trust not to take*

Every disposition of property shall be made directly to the person in whom the right to possession and income is intended to be vested and not to another in trust for such person, and if made to any person in trust for another, no estate, legal or equitable, vests in the trustee. But neither this section nor 7–1.1 shall apply to trusts arising or resulting by implication of law.

The effect of this provision is to vest the title of a passive or dry trust in its beneficial owner. In *Bing v. People,* 254 N.Y. 484, 173 N.E. 687 (1930), the Court of Appeals held that where a corporation did nothing except lend its name to hold title to the land, it was nothing more than the trustee of a passive trust. In the instant case, the arguably beneficial owner of the FNJ stock was OPM and Cali. This finding may be predicated, after trial, *inter alia,* on the declaration in the stock purchase agreement that Goodman and Weissman were "d/b/a as OPM Leasing Services Co., Inc" and on Goodman and Weissman's declaration on July 29, 1978 that OPM and Cali were the intended legal owners of the stock. Also, in OPM's Local Court Rule XI–2 affirmation accompanying OPM's Chapter 11 filing, Weissman declared that OPM was the actual owner of the FNJ stock.

██ Similarly, the doctrine of constructive trust under New York law may apply. In any event, the law in New York surely does not preclude its application as a matter of law under these facts.[10]

██ Moreover, under the laws of Louisiana, New York and the Code, it is well-established that a trustee is not bound by the acts, conduct and writings of OPM and Cali or estopped thereby. A trustee acts as a representative of creditors, not of the debtor, in exercising his avoiding powers under Code Sections 544 and 548. *See, e.g., Fairbanks Shovel Co. v. Wills,* 240 U.S. 642, 648, 36 S.Ct. 466, 468, 60 L.Ed. 841 (1916); *In re McDonald,* 173 F. 99 (D.Mass.1908) (under predecessor sections 67(a) and 70(c) of the

---

**10.** A constructive trust is one imposed in equity under New York law "when property has been acquired in such circumstances that the holder of the legal title may not in good conscience retain the beneficial interest." *Sharp v. Kosmalski,* 40 N.Y.2d 119, 121, 351 N.E.2d 721, 386 N.Y.S.2d 72 (1972); 61 N.Y.Jur. Trusts § 125 (1968); 4 Collier on Bankruptcy § 541.13 (15th ed. 1981). For example, in *Studley v. Lefrak,* 66 A.D.2d 208, 412 N.Y.S.2d 901 *aff'd,* 48 N.Y.2d 954, 401 N.E.2d 187, 425 N.Y.S.2d 65 (1979), the court held that an officer/director who received a fraudulent conveyance of the corporation's assets became a constructive trustee of these assets in favor of the corpora-

tion's creditors. *Accord, In re Penn Dixie Steel Corp.,* 6 B.R. 817, 824 (Bkrtcy.S.D.N.Y.1980), where this Court stated that a constructive trust "arises where a person clothed with some fiduciary character, by fraud or some action on his part, gains something for himself which, except for his act, he would not have procured and it is inequitable for him to retain." Moreover, the abolition in certain contexts of a resulting trust by EPTL § 7–1.3 was intended to have no effect on the doctrine of constructive trust or the recognition of trusts *ex maleficio. See* Volume 17B, EPTL Section 7–1.3 Practice Commentary (McKinney Supp.1982).

Act, trustee not estopped from claiming invalidity of mortgages due to misrepresentations of debtor).

Along these lines, the Second Circuit has ruled that a trustee's right to recover payments made by the debtor is not barred by the prepetition wrongful conduct of the debtor. *See In re Leasing Consultants, Inc.,* 592 F.2d 103 (2d Cir.1979). In *Leasing Consultants,* the trustee sought to recover payments made by the debtor to counsel which had been made in exchange for illegal services. The Second Circuit rejected the contention that the trustee's claim was barred by the doctrine of *in pari delicto,* stating that "even if Leasing itself would be barred by the defense of *in pari delicto* from recovering the payments ... it does not follow that an action taken by the trustee acting as the representative of Leasing's *creditors* must similarly fail." *Id.* at 110. *Accord, In re IMFC Financial Corp.,* 11 B.R. 874 (Bkrtcy.S.D.N.Y.1981); *In re Sergio, Inc.,* 16 B.R. 898 (Bkrtcy.D.Haw. 1981) (where constructive trust was imposed in favor of trustee although assets had been conveyed without bona fide consideration).

Accordingly, under the law of Louisiana, New York and the Code, the pivotal issues of fact required to be resolved at trial include: (1) Did LNB have notice, whether actual or constructive, of Goodman and Weissman's fiduciary duties to OPM and Cali and their wrongful diversion and use of corporate assets? (2) Did LNB fully investigate all of the data available regarding the propriety of making a loan directly to corporate officers and directors in their individual capacities and then receiving solely corporate funds in repayment? (3) Did LNB aid or abet Goodman's and Weissman's diversion of corporate assets? If so, how did they accomplish this assistance and exactly to what extent is LNB responsible for the resultant creditor losses?

## IV. *Conclusion*

Based upon the foregoing, it is the conclusion of this Court that there is nothing in the laws of Louisiana, New York or the Code which categorically bars as a matter of law the relief the Trustee seeks. Hence, the numerous questions of fact described above affecting both the threshold conflicts question and the ultimate question on the merits are material to the ultimate judgment in this proceeding and must await determination through the crucible of trial. Accordingly, LNB's motion for summary judgment dismissing the allegations against it in the Trustee's amended complaint is denied.

It is SO ORDERED.